22 U.S. 241
 6 L.Ed. 81
 9 Wheat. 241
 KIRK and others, Plaintiffs in Error,
v.
SMITH, ex. dem. PENN, Defendant in Error.
 February 5, 1824
 
 ERROR to the Circuit Court of Pennsylvania. This was an ejectment, brought by the defendant in error, in the Court below, to recover the possession of certain lands in York county, in the State of Pennsylvania. On the 4th of March, 1681, Charles II. granted to William Penn, the ancestor of the lessor of the plaintiff below, that tract of country which now constitutes the State of Pennsylvania. The grant contains special powers to erect manors and to alien the lands, with liberty to the alienees to hold immediately of the proprietor and his heirs, notwithstanding the statute of quia emptores. On the 11th of July, in the same year, William Penn, having interested many persons in his grant, agreed with 'the adventurers
 On the 4th of March, in the year 1681, Charles II. granted to William Penn, the ancestor of the plaintiff in the Circuit Court, that tract of country which now constitutes the State of Pennsylvania. By this grant, the property in the soil, as well as in the right of government, was conveyed to William Penn and his heirs, in fee simple.
 The grant contains special powers to erect manors, and to alien the lands, with liberty to the and purchasers' in England, on 'certain conditions and concessions,' which, being for their mutual advantage, were to be obligatory in the future management of the property and settlement of the province. The 9th of these conditions is, that 'in every 100,000 acres, the Governor and proprietary, by lot, reserveth ten to himself, which shall lie but in one place.' In the year 1762, a warrant was issued for the survey of the manor of Springetsbury. This warrant recites a former survey of the same land, in 1722, as a manor; states the general outlines of such former survey, and directs a resurvey. This resurveying was made, and returned into the land office in 1768, where it has remained ever since. This resurvey included the lands claimed by the plaintiffs in error, which were held under warrants, of which the following is a specimen:
 'Pennsylvania, ss: BY THE PROPRIETARIES.
 'Whereas, Partholomew Sesrang, of the county of Lancaster, hath requested that we would grant him to take up two hundred acres of land, situate between Codorus creek and Little Conewaga creek, adjoining the lands of Killian Smith and Philip Heintz, on the west side of the Susquehannah river, in the said county of Lancaster, for which he agrees to pay to our use the sum of fifteen pounds ten shillings, current money of this province, for each hundred acres; and the yearly quit-rent of one halfpenny sterling for every acre thereof. 'These are, therefore, to authorize and require you to survey, or cause to be surveyed, unto the said Bartholomew, at the place aforesaid, according to the method of townships appointed, the said quantity of 200 acres, if not already surveyed or appropriated; and make return thereof into the secretary's office, in order for further confirmation; for which this shall be your sufficient warrant: which survey, in case the said Bartholomew fulfil the above agreement within six months from the date hereof, shall be valid; otherwise void.
 'Given under my hand and seal of the land office, by virtue of certain powers from the said Proprietaries, at Philadelphia, this eighth day of January, Anno Domini one thousand seven hundred and forty-two.
 GEORGE THOMAS.'
 [L. S.]
 'TO WM. PARSONS, Surveyor General.'
 'In virtue of this warrant, a survey of the land claimed by Caleb Kirk, one of the plaintiffs in error, was made on the 12th of October, 1747, in favour of Jacob Wagner, the then holder of the warrant, by various mesne transfers. The title was regularly deduced by various conveyances, from Wagner to Kirk, accompanied with possession. No grant was ever issued for the land. Ten pounds, a part of the consideration, were paid about the date of the warrant, and there was no proof of the payment of the residue. It appeared to have been the usage of the proprietaries, not to insist upon the terms of the contract, by which the survey was declared to be void, unless the agreement was fulfilled within six months from the date of the warrant, and large arrearages of purchase money remained due after the surveys were made both within and without the manors. The only distinction appears to have been, that the reserved lands were sold by special contract; and the lands not reserved, were sold at stated prices.
 At the commencement of the war of the American revolution, the proprietary went to Great Britain, where he remained; and in the year 1779, the legislature of Pennsylvania passed an act, entitled 'an act for vesting the estates of the late proprietaries of Pennsylvania, in this commonwealth.' The ejectment was brought in the year 1819, and on the trial of the cause, the question whether the land in controversy was included within the lines of the manor of Springetsbury, as surveyed under the warrant of 1762, was left to the jury, who found that it was included within those lines. The opinion of the Court below, was, that if the land was within those lines, the right of the plaintiff below was excepted out of the general operation of the act of 1779, and was not vested in the commonwealth. The court also instructed the jury, that the statute of limitations of 1705, commonly called the 'seven years law,' was inapplicable to the case. To these instructions, the defendant's counsel excepted, and a verdict and judgment for the plaintiff having been rendered in the Court below, the cause was brought by writ of error to this Court.
 March 14th, 1823.
 The cause was argued by Mr. Clay and Mr. Webster for the plaintiffs in error, and by the Attorney General and Mr. Sergeant for the defendants in error.
 On the part of the plaintiffs in error, it was contended, 1. That the rights derived to the plaintiffs below, were proprietary, and not manorial. Being in their origin proprietary, they were not, and could not be, affected by the survey of a manor in 1768, subsequent to their commencement.
 2. That the rights, being proprietary, and not manorial, vested in the Commonwealth of Pennsylvania, by the right of conquest, and the act of confiscation of 1779. The 7th section confirms all persons, and, consequently, the plaintiffs below, in their rights, derived from the proprietaries. The act must be construed according to its intention, ascertained by a comparison of all its parts. The intention was to confiscate the proprietary rights, wherever situated; and to reserve the private or manorial rights, wherever located. If a proprietary right was situated within a manor, it was to be confiscated. If it were part of the manor, that is, of the right springing out of the manor, it was reserved. There is no reservation to the proprietaries of the arrears of purchase money due within manors. There is only an exception from the operation of the abolition of quitrents and arrears of purchase money, within manors; and this exception must be construed to mean the case of lands bought as part of the manor. It would be to contradict the whole scope and meaning of the act, to construe it as abolishing proprietary rights every where but in manors, and to leave them there in full vigour. According to this view of the act, we shall have a consistent and congruous interpretation. The public rights of the proprietaries, wherever situated, will have been confiscated; and the private rights, wherever situated, will have been preserved. The Court will look to the nature of the thing, and not to the accident. If a proprietary right be situated within a manor, it will be abolished, because it is proprietary. Such is the construction which the local Legislature itself has put upon this statute, by the act of 1781, for establishing the land office,[1] and by the act of 1784[2]. These acts are contemporaneous, and in pari materia. If, then, the rights of the proprietors were vested in the State, there remained nothing in them; the legal title passed to the Commonwealth, and, consequently, they could not maintain this action of ejectment. But if any was reserved, it was only the arrears of the purchase money, and not the title, which they might sue for in any manner.
 3. That whatever might be the nature of the claim, (manorial or proprietary,) it was barred by the statute called the seven years law, passed in 1705, whether the consideration money is paid or not[3]. This limitation of seven years, appears to have been a favourite period of protection in Pennsylvania. William Penn enacted a law to that effect, in England, the year after he obtained his charter;[4] and again, in 1700, the same period is provided.[5] And a short period of limitation to protect possessions, is believed to have been the favourite policy of all the colonies. The act of 1705, to afford the protection which it intends to give, requires two circumstances: 1. That the entry should be under an equitable estate. 2. That there should have been seven years quiet possession. The intention of the act was to protect the property. The vendor was at liberty to enforce payment of the consideration money, by all legal means. Even the land itself was not withdrawn from the operation of a judgment. After seven years, the title was complete, but it was still liable to execution. If the plaintiffs in ejectment can recover, it is because they have a lien. Now, if the lien were express, it would have been barred by the lapse of twenty years; and no lien, created by operation of law, can be more durable, than one created by express act of the party.[6] To support this right of recovery, would be to uphold a remedy after the right is gone, and to make the remedy immortal, whilst the right is temporary.
 4. That the payment of the purchase money ought to have been presumed; and, consequently, a perfect equitable title in the defendants, barring the action of ejectment. The length of time elapsed, would have authorized a jury to presume a charter, patent, or deed.[7] The fact of actual payment being made out by presumption, the Courts of Pennsylvania adopt the Chancery principle of considering that as done which ought to be done.[8] When a party, entitled to a conveyance, does every thing necessary to be done, in order to obtain a decree for a specific performance, he stands by the local law, in a situation to support or defend an action for the possession of the land.[9]
 5. That the plaintiffs below were barred by the statute of limitations of 1785.[10] If we had entered by disseisin, our right would have been protected. We entered claiming the whole fee. Our title and our possession were, therefore, exclusive; that is to say, adverse to every other title or possession. It is said that it was not adversary, because we claim from them: but the mortgagee claims from the mortgagor, and, nevertheless, is barred after twenty years. The idea of an amicable possession, is founded upon confounding the case with that of leases, reversions, and remainders. If the vendee purchases the whole estate, his possession, from the moment of his entry, is adverse to that of the vendor.[11] But, from the period of the survey of 1768, there was an adverse state of possession. The proprietaries set up their manorial or private right against their public or proprietary right, and from that epoch, inconsistent and opposing titles were brought into being. From that moment, the statute of limitations began to run. There is no escape from this dilemma: either the survey of the manor did not affect, in any way whatever, the previous proprietary right, or it did, and was an attempt to reappropriate to the use of the manor, what had been appropriated before. In the first case, the right was confiscated; in the latter it is barred.
 For the defendants in error, it was stated, that, by the royal charter to William Penn, of 1681, he derived an absolute right of ownership to the territory within the limits described, and power to grant, subject to no restrictions but such as he thought fit to impose upon himself. He came to Pennsylvania in 1682; and the powers of government and rights of property were always kept distinct, the former being exercised by the General Assembly, and the latter by means of an agency, constituting what is called a land office. Two principles were early settled, that no sales were to be made, nor settlements permitted, till the Indian title should be extinguished; and that no title could originate but by grant from William Penn. In the establishment of the land office, it was originally intended that no title should begin but by warrant and survey. But this was soon broken in upon; every kind of irregularity occurred; and, finally grew up the title by settlement and improvement.[12] All these inceptive rights were under the proprietary, and they were to be consummated by payment of the purchase money and issuing the patent. For that purpose, the warrant fixed a price and time of payment; and where there was no warrant, the price of the time was to be paid, which was called 'common terms.' The mass of the country was opened by opening the land office, but this did not include proprietary tenths and manors. These last were appropriated by virtue of his own right of ownership, and are not to be understood as meaning a manor in a legal sense, with its court and train of feudal appendages. The term did not mean a private reservation, for his own separate use, to be taken out of the market, and granted in a different mode. It meant only a portion of country, separated from the common mass, so as not to be open to purchasers (on common terms) or to settlers. The peculiar and appropriate mode of granting in a manor, was a warrant to agree. It was, in fact, an exception out of the country offered for sale. No particular form of exceptions was necessary, and none was pursued.[13] He was subject to laws, but only to his own laws. He might be considered as saying, 'So much I will sell at a fixed price; so much at the value to be agreed.' W. Penn died in 1718, and a dispute arose with Lord Baltimore respecting the boundary line of Maryland,[14] which was settled by an agreement between the two proprietaries, in 1732, and ratified by decree in Chancery, in 1750.[15] The line was finally run in 1768, and ratified by the King in Council, in 1769. In 1732, the Marylanders encroaching, and the Indians growing uneasy, Sir W. Keith, at the request of the latter, issued an order to survey the manor of Springetsbury, which was accordingly surveyed in that year. The land office was not then open west of the Susquehannah, the Indian title not being extinguished. In 1736, before the land office was opened, Thomas Penn, the proprietary, recognised and adopted the survey, and thereby gave it validity. In 1762, the survey of 1732 having been mislaid or lost, Gov. Hamilton issued a warrant of resurvey, which was duly returned into the land office, in 1768, where it has since remained. VOL. IX.
 When the revolution occurred, the descendants of the proprietary were the owners of all the vacant lands in the province; they had the legal estate in all lands, to which individuals had only acquired inceptive rights, for the purpose of enforcing the terms; they were entitled to all purchase money, and to all quit-rents; they had also private estates subject to the ordinary legislation. The whole, as then existing, may be arranged into three classes. (1.) Their private estates, which may be at once dismissed. (2.) Estates or rights in lands not included, in the limits of manors: and these might be legal, or legal and equitable. (3.) Estates or rights in lands included within the limits of manors: which might also be legal, or legal and equitable. And the nature of their legal right to lands within a manor, would depend upon the nature of the equity of the occupant. Whether his equity be more or less, is of no consequence at law, since it does not diminish the extent or power of the legal right. These inceptive rights are passed from hand to hand, by deed; they descend, are devised, and sold by the Sheriff; and every body knows their nature, and the liabilities to which they are subject. The deeds frequently express it, as in the present instance. Hence the lapse of time affords no presumption of the payment of the purchase money, or completion of the title. In truth, there is no such thing in Pennsylvania as the presumption of a grant.
 This was the state of things at the period of the revolution. That event, ipso facto, determined the powers of government conferred by the charter, but left the rights of property exactly as they stood before, in which state they remained until the act of 1779. That act devests the estate of the proprietaries, only by vesting it in the Commonwealth. It, therefore, devests no further than it vests; and as to all besides, leaves it on the same footing as before. It did not at all change the relation between the proprietaries and those who had purchased their lands. They then had, and still have, a land office, to receive purchase moneys and grant patents. The Commonwealth land office will not receive the purchase money of lands included in the limits of manors, nor will they grant patents for it. The act thus had the effect of making a partition, and from that time forward there have, in fact, been two land offices in Pennsylvania. Great indulgence has been shown in the collection of the purchase money; but the tenure has never undergone any change, and it has never been doubted that the legal title remained in the proprietors and the Commonwealth, respectively, and that they might at any time enter, to enforce the terms of sale.
 The act of 1779 did not assert that the estates of the proprietaries had been devested by the revolution, nor could that proposition now be maintained, if the question were open. It did not profess to confiscate their property, nor could it justly do so, for they had committed no offence. Neither did it assert a right of conquest. The act was not passed to benefit individuals, nor to alter or lessen their just liability. It was a partition between the Commonwealth and the proprietary of all their estates, legal and equitable, of which the manor lines were the lines of division. It left the proprietors, then, their vacant lands, their legal estates, and all else within the manors. The terms of the act give no countenance to the idea, that the legal title was assumed by the Commonwealth, leaving the purchase money to the proprietaries. The reservation is of private rights. But the whole of this question has been long since disposed of, and it is now considered as settled law in Pennsylvania, that the legal estate is in the descendant of the proprietaries, as a security for the purchase money.[16]
 As to the seven years law of 1705, it has never been heard of since the time of its enactment, and we are, therefore, compelled to look for a construction of it consistent with its disuse. It is a retrospective law in its very terms, and, having performed its office at the time, has been ever since disused. No such construction as that insisted on, ever could have been given to it.
 As to the presumption of payment, it must be founded, in every such case, both upon the length of time, and the omission to do what would be done if the presumed fact did not exist. It is a presumption merely, and may be repelled by circumstances, showing why an earlier demand has not been made.[17] No such presumption, therefore, exists, unless the forbearance be unusual, or contrary to what might have been expected. But it has been the universal practice to forbear. If there had been a payment, there would have been a patent. Where the fact to be proved must appear by deed, the presumption, from length of time, does not arise.[18] The surveys, if made, were never returned; therefore, there could have been no payment. The receiver general's books will show what has been paid.
 The statute of limitations of 1785, is not a bar. To make possession a bar, it must be adverse.[19] It may be adverse as to one, and not as to another. A possession under one, is not adverse to him. Possession under an agreement, is not adverse;[20] and ouster cannot be presumed where the possession is not only under, but according to the agreement. To maintain a title, or a claim, of adverse possession, such possession must be adverse at its commencement, and so continue for twenty years.[21] There must be, at least, a claim, or colour of title, adverse or hostile; though it is not necessary that it should be a good title.[22] A person who enters without claim, or colour of title, is deemed to be in possession in subservience to the legal owner, and no length of time will make it adverse.[23] The doctrine of adverse possession must be strictly taken, and the fact must be made out by clear and positive proof, and not by inference. Every presumption is in favour of a possession, in subordination to the title of the true owner.[24] If the defendant has acknowledged the plaintiff's title, he cannot, afterwards, dispute it.[25] So, an acknowledgment, by a person under whom the defendant claims, that he went into possession under the lessors of the plaintiff, is conclusive against the defendant, as to tenancy. And though it may not have that effect, yet it will prevent possession from being adverse.[26] In the present case, it is not disputed, that the defendants went into possession under the proprietors, and nothing has since occurred to change the character of the possession. No one could hold adversely, unless he came in by title paramount to the proprietary; and no title against the Commonwealth, or grantee of the Commonwealth, can be acquired by length of time.[1] The possession of lands held by warrant and survey, is not adverse to, but under the Commonwealth.[2]
 The cause was continued to the present term for advisement.
 February 5.
 Mr. Chief Justice MARSHALL delivered the opinion of the Court.
 
 
 1
 This is a writ of error to a judgment rendered by the Circuit Court for the District of Pennsylvania, in favour of Penn's lessee, who was plaintiff in a writ of ejectment. The case depends on a bill of exceptions taken to the opinion of the Court, expressed in a charge to the jury. alienees to hold immediately of the proprietor and his heirs, notwithstanding the statute of quia emptores. On the 11th of July, in the same year, William Penn, having interested many persons in his grant, agreed with the 'adventurers and purchasers' in England, on 'certain conditions or concessions,' which being for their mutual advantage, were to be obligatory in the future management of the property and settlement of the province. The 9th of these conditions is, that 'in every 100,000 acres, the governor and proprietary, by lot, reserveth ten to himself, which shall lie but in one place.'
 
 
 2
 It would seem as if this article should be construed as restraining the power of the proprietor. Being the absolute owner of the soil, it was in his power, independent of contract, to sell, or not to sell, any part of it. But, as the value of the lands must necessarily depend on the progress of settlement, it was obviously the interest of the great purchasers and adventurers, as well as of the proprietor, that he should open the country generally to emigrants. It was also the interest of the proprietor, to make large reservations for his private use, that he might avail himself of the increased value to be derived from settlement. To prevent his checking the advance of the settlements by unreasonable reservations, this article fixes the proportion of land which he may take out of the general stock offered to the public. The great mass of land was in the market, to be acquired by any adventurer, at a given price; but out of this mass, the proprietor reserved for himself one tenth, to lie in bodies of not less than 100,000 acres.
 
 
 3
 The survey reserving these lands for his own use, whether distinguished by the common appellation of manor, or by any other name, was not to give any new title to the proprietor. The sole effect was, to separate the land so surveyed from the common stock, and to withdraw it from the market. The survey was notice to all the world, that the land was not subject to individual appropriation on the common terms, but could be acquired only by special contract.
 
 
 4
 It was not the intention, because it could not be the interest of the proprietor, to continue all these manors, or reserved lands, as unoccupied wastes, but to sell them at such advanced price as the continuing progress of settlement and increase of population would justify. The lands reserved, and the lands not reserved, belonged equally to the proprietor, and were equally for sale. The only difference between them was, that the lands not reserved, were offered to the public at a fixed price, while those which were reserved, could be acquired only by special agreement. This difference produced the distinction, of which we have heard in argument, and which seems to have been well understood in Pennsylvania, between warrants on the common terms, and warrants to agree.
 
 
 5
 In the year 1762, a warrant was issued for the survey of the manor of Springetsbury. This warrant recites a former survey of the same land, in 1722, as a manor, states the general outlines of such former survey, and directs a resurvey. This resurvey was made, and returned into the land office, in the year 1768, where it has remained ever since, among the documents of the land titles in Pennsylvania.
 
 
 6
 This resurvey included the lands of the plaintiffs in error, which were held under warrants, of which the following has been selected as a specimen:
 
 
 7
 'Pennsylvania, ss.: BY THE PROPRIETARIES.
 
 
 8
 'Whereas, Bartholomew Sesrang, of the county of Lancaster, hath requested that we would grant him to take up two hundred acres of land, situate between Codorus creek and Little Conewaga creek, adjoining the lands of Killian Smith and Philip Heintz, on the west side of the Susquehannah river, in the said county of Lancaster, for which he agrees to pay to our use the sum of fifteen pounds ten shillings, current money of this province, for each hundred acres; and the yearly quit-rent of one halfpenny sterling for every acre thereof.
 
 
 9
 'These are, therefore, to authorize and require you to survey, or cause to be surveyed, unto the said Bartholomew, at the place aforesaid, according to the method of townships appointed, the said quantity of 200 acres, if not already surveyed or appropriated, and make return thereof into the secretary's office, in order for further confirmation; for which this shall be your sufficient warrant: which survey, in case the said Bartholomew fulfil the above agreement within six months from the date hereof, shall be valid; otherwise void.
 
 
 10
 'Given under my hand and seal of the land office, by virtue of certain powers from the said Proprietaries, at Philadelphia, this eighth day of January, Anno Domini one thousand seven hundred and forty-two.
 
 
 11
 GEORGE THOMAS.
 
 
 12
 [L. S.]
 
 
 13
 'TO WM. PARSONS, Surveyor General.'
 
 
 14
 In virtue of this warrant, a survey of the land claimed by Caleb Kirk, one of the plaintiffs in error, was made on the 12th of October, 1747, in favour of Jacob Wagner, the then holder of the warrant, by various mesne transfers. The title was regularly deduced by various conveyances, from Wagner to Kirk, accompanied with possession.
 
 
 15
 No grant has been issued for the lands. Ten pounds, in part of the consideration, were paid, about the date of the warrant, and there is no proof of the payment of the residue.
 
 
 16
 It appears to have been the common usage, for the proprietaries to give great indulgence to the purchasers of lands, for the purchase money. Although, by the terms of the contract, the survey was declared to be void, unless the agreement were fulfilled in six months, yet the proprietaries appear not to have been in the practice of availing themselves of this condition. Large arrearages of purchase money remained due after the surveys were made, which, as the grants were withheld, were debts upon interest, secured in the best possible manner. This credit was mutually advantageous. By accelerating the settlement of the province, it was beneficial to the proprietaries; and the purchaser could terminate it whenever it ceased to be beneficial to himself.
 
 
 17
 Until the war of our revolution, this state of things appears to have continued. The settlements advanced with great rapidity. Manors were surveyed, lands were sold, and large arrearages were due for purchases made, both within and without the manors. The only distinction appears to have been, that the reserved lands were sold by special contract, and the lands not reserved, were sold at stated prices.
 
 
 18
 When the war of our revolution commenced, the proprietary went to Great Britain, and was, consequently, to be considered as a British subject, not as an American citizen. The right to confiscate his property, or to leave it untouched, was in the government of Pennsylvania. The Legislature of that State, for reasons satisfactory to itself, took a middle course. In 1779, an act was passed, entitled 'An act for vesting the estate of the late proprietaries of Pennsylvania in this Commonwealth.' This ejectment was brought in the year 1819.
 
 
 19
 On the trial of the cause, the question, whether the land in controversy was included within the lines of the manor of Springetsbury, as surveyed under the warrant of 1762, was left to the jury, who have found that it was included within them. The opinion of the Judges who tried the cause, was, that if the land was within those lines, the right of the plaintiff, in that Court, was excepted out of the general operation of the act of 1779, and was not vested in the Commonwealth.
 
 
 20
 To this opinion an exception was taken, which has been supported in this Court by arguments, in part, applicable to warrants of every description; and, in part, to those only which were issued on the common terms.
 
 
 21
 In that part of the argument which applies to all warrants, the plaintiffs in error contend, that the 5th section of the act of 1779, vests all the rights of the proprietary in the commonwealth, with the exception of those only which are reserved by other sections of the same act; and that the right to the purchase money, which then remained unpaid, is comprehended within the general words of the 5th section, and not excepted in any other section.
 
 
 22
 In considering this argument, it will be necessary to examine the 5th section critically, and to ascertain its extent with precision.
 
 
 23
 It enacts, 'that all and every the estate, right, title, interest, property, claim, and demand, of the heirs,' &c. 'or others claiming as proprietaries of Pennsylvania,' 'to which they, or any of them, were entitled, or which to them were deemed to belong on the 4th day of July, 1776, of, in, or to, the soil and land contained within the limits of the said province,' 'together with the royalties, franchises, lordships, and all other the hereditaments and premises comprised, mentioned, or granted in the same charter or letters patent of the said King Charles the second, (except as hereinafter is excepted,) shall be, and they are hereby vested in the Commonwealth of Pennsylvania.'
 
 
 24
 The first part of the description of that which the Legislature intended to vest in the Commonwealth, comprehends all the rights of the proprietaries in the 'soil and land' of Pennsylvania, but comprehends nothing else. It would not, we presume, be contended, that this part of the description would embrace the purchase money due for land, if any such case existed, which had been sold and conveyed by the proprietary, and for the purchase money of which a bond had been taken. This act could not, we presume, be pleaded in bar to an action of debt on a bond given to secure the payment of money due for land. This section, at least, is directed against the landed estate of the proprietary, not against his claims for money.
 
 
 25
 If this first part of the description does not reach debts on account of land sold, neither does the second. It seems almost useless to observe, that a debt for land sold, is neither 'a royalty, franchise, lordship, or other hereditament;' and that it forms no part of the premises granted in the charter.
 
 
 26
 The subsequent part of the section vests nothing. It contains only a more ample description of the absolute and unqualified manner in which the property, previously described, is to vest in the Commonwealth. It is freed and discharged from every incumbrance, claim, or demand whatsoever, as fully as if the said charter, &c. 'and all other the estate, right, and title, of the said proprietaries, of, in, and to the same premises, were herein transcribed and repealed.'
 
 
 27
 It is unnecessary to comment on the particular words of the legislature, which are regularly and technically applicable to the charter, because it is too obvious for controversy, that the whole design and effect of the clause is to show, that the property described in the preceding confiscating clause, is to vest in the Commonwealth, freed from every trust, limitation, or incumbrance whatsoever. But the property comprehended in the confiscating clause, was land only; and the land of the proprietaries, together with the royalties, &c. annexed to it.
 
 
 28
 If, then, the particular subject of this controversy be within the 5th section of the act of 1779, it is because it is to be considered as land to which the proprietaries were entitled. If not so considered, the 5th section does not vest it in the Commonwealth. If it be so considered, the next inquiry is, whether it be within the exceptions made by the act.
 
 
 29
 The 8th section provides and enacts, 'that all and every the private estates, lands and hereditaments of any of the said proprietaries, whereof they are now possessed, or to which they are now entitled, in their private several right or capacity, by devise, purchase of descent; and likewise all the land called and known by the name of 'the proprietary tenths,' or manors, which were duly surveyed and returned into the land office, on or before the 4th day of July, in the year 1776, together with the quit or other rents, and arrearages of rents, reserved out of the said proprietary tenths, or manors, or any part or parts thereof, which have been sold, be confirmed, ratified and established forever, according to such estate or estates therein, and under limitations, uses, and trusts, as in and by the several and respective reservations, grants, and conveyances thereof, are directed and appointed.'
 
 
 30
 This section reserves the private estates of the proprietaries, 'and likewise all the lands called and known by the name of 'the proprietary tenths,' or manors, which were duly surveyed and returned into the land office, on or before the 4th day of July, in the year 1776.'
 
 
 31
 That the manor of Springetsbury was dulys urveyed, and returned into the land office before the 4th of July, 1776, has not been controverted in this Court, so far as respects land not sold before the resurvey, which constitutes the question now under particular consideration; and that the land for which this ejectment was brought, lies within the survey describing the external boundaries of that manor, is established by the verdict of the jury. The dilemma, then, presented to the plaintiffs in error, is a fair one. The legislature did or did not consider the right reserved by the proprietary to re-enter and avoid the warrant, or to re-grant the land, as an estate or interest in the soil, as land, even before such right was asserted. If it was so considered, and, as land, was confiscated by the 5th section, then it was likewise so considered in the 8th section; and, as land, was excepted and saved to the proprietary. If the Legislature considered this right merely as a claim to money, secured on the land, then it is not confiscated by the 5th section, but remains to the proprietor, unaffected by it. We can perceive no principle of sound construction, by which, comparing the 5th and 8th sections with each other, the 5th shall, so far as respects land in manors, be made more comprehensive than the 8th; no principle by which the confiscating clause shall be made broader than the saving clause.
 
 
 32
 It was necessary to reserve the quit-rents expressly in the 8th section, because they may, on fair construction, be understood to be comprehended in the 5th section; and, consequently, to be vested in the Commonwealth, if not expressly excepted. The quit-rents would not, indeed, be confiscated by that part of the section which relates to soil or land; but may very well pass under the words 'royalties, franchises, lordships, and all other the hereditaments and premises comprised, mentioned, and granted in the same charter, or some of them.' The quit-rent is a hereditament, reserved under the very words of the charter, and annexed to the seignory. It would not be absolutely improper, to term it 'royalty,' since similar reservations are generally to be found in grants made to individuals in the royal governments. The express exception of quit-rents, therefore, without mentioning the arrears of purchase money, furnish no argument in favour of the plaintiffs in error. The quit-rents were excepted in the 3th section, because they would, if not excepted, have been vested in the commonwealth by the 5th. The arrears of purchase-money were not excepted, because they did not pass the 5th section. But if the quit-rents were not compromised in the 5th section, they were abolished in the 9th, and might, therefore, without impropriety, be included in the exception of the 8th, so far as respects manors.
 
 
 33
 There is nothing in the act of 1779, which would lead to the opinion, that the legislature was actuated by a spirit of hostility against the Penn family. No disposition is shown to confiscate the debts, generally, which were due to that family. The great object of the act was, to transfer the right to the soil of Pennsylvania, from the proprietary to the commonwealth. This was a great and a national object. It was of the more pressing importance at the moment, because no means existed, at the time of obtaining titles to ungranted lands, in consequence of which, as the 4th section recites, "multitudes of inhabitants were daily emigrating from the state." In accomplishing this great object, the legislature was not unmindful of the ties by which Pennsylvania had been formerly connected with the proprietor. In addition to the private estates of the family, to the manors actually surveyed, and to the quit-rents reserved, on the lands sold within those manors, 120,000 pounds sterling are bestowed on the family, among other considerations, "in remembrance of the enterprising spirit which distinguished the founder of Pennsylvania." Not only, then, is there nothing in the act evincing that vindictive, hostile temper, which would justify the court in extending it, by construction, to objects not fairly embraced by its terms, but its whole spirit is in opposition to the idea. Taking this view of the subject, we should be astonished, indeed, to find, that the same Legislature which left untouched the accruing quit-rents on the lands sold within the manors, as well as those which were in arrear, should seize the arrears of purchase money within the same manors; that the Legislature should spare, so far as respected the manors, that which partook, in its nature and essence, of the proprietary character, and should seize that which was, in its essence, private debt, and was distinguishable from other private debts in nothing but in the manner in which it was secured.
 
 
 34
 The 5th and 8th sections, then, leave the arrears of purchase money due for land sold within the manors, precisely in the situation in which the act found them.
 
 
 35
 Both parties have resorted to the 9th and 10th sections of the act.
 
 
 36
 The 9th section discharges all the lands held under the late proprietaries, not within the tenths or manors, from quit-rents, or arrearages of quit-rents, and arrearages of purchase money. And the 10th section provides 'that the said arrearages of purchase money, other than for lands within the said tenths and manors, shall be accounted to be due and payable to the Commonwealth.'
 
 
 37
 No man who reads this act, will be at a loss for the motive which induced the draftsman of the bill to introduce the 9th section. The 5th and 8th taken together, would leave all the lands of Pennsylvania still chargeable with quit-rents, and would vest those not within the manors, in the Commonwealth. It was the intention of the Legislature to discharge the lands not within the manors, from this burthen, and a section was necessary for that purpose. Read the section, omitting the words respecting the purchase money of lands not within the manors, and it expresses, with plainness and perspicuity, the idea which has been suggested. All who are acquainted with our course of legislation, know, that after a bill has been framed, and the language adapted to its objects, amendments are sometimes introduced into it, in a late stage of its progress, without being sufficiently cautious to change the language which was adapted to the original matter, so as to fit it to the new matter contained in the amendment. This can alone account for the perplexity and confusion of the 9th and 10th sections of this act. The 9th section, which is so perfectly clear without the words respecting the arrearages of purchase money for lands not within the manors, is so embarrassed and confused with them, as to be scarcely intelligible; and the whole office of the 10th section is, to vest in the Commonwealth a part of that which the 9th had abolished. Courts must, however, give to these sections that interpretation which seems best to comport with the intention of the Legislature.
 
 
 38
 The 8th section had confirmed to the proprietors, for ever, the quit-rents reserved in the manors. The 9th, while was intended to abolish all quit-rents on all other lands, commences with general words, which in themselves would comprehend the quit-rents of the manors, and produce a conflict between the two sections, were not those general words limited and explained afterwards. But they are limited and explained by the words, "other than the quit or other rents, reserved within the proprietary tenths or manors before mentioned." Between the general words, however, with which the clause commences, and those words of limitation, which have been just recited, are introduced the words, "and arrearages of purchase-money for lands not within the tenths or manors aforesaid." Because the words of limitation apply to the quit-rents only, and not to the purchase-money, it has been supposed, that the purchase-money for lands within, as well as without, the manors, has been abolished, and that the concluding words of the section, that the "same lands shall be held free and discharged therefrom, for ever," apply to the purchase-money of lands within the manors, as well as to the quit-rents of lands not within the manors.
 
 
 39
 This construction cannot, we think, be sustained. The general words which introduce the section, required the exception and limitation afterwards introduced, so far as respected quit-rents; but the words respecting purchase-money, contain their limitation within themselves. The words of description exclude lands within the manors. No general words are applied to the purchase-money, which require subsequent explanation or diminution. The words of limitation too, are, in themselves, applicable to quit-rents only. When, then, we come to the enacting part of the clause, which ordains that the 'same lands and other hereditaments, shall be held free and discharged therefrom, and from the payment thereof, for ever;' and ask, what are the same lands? and from what are they discharged? the only answer which can be made to the question is, that 'the same lands' are lands not within the manors; and that the discharge is 'from all quitrents other than the quit or other rents reserved within the proprietary tenths or manors, before mentioned,' 'and arrearages of purchase money for lands not within the tenths or manors afore said.' That the Legislature deemed it necessary, by one of these sections, to take from the proprietaries the arrearages of purchase money not within the manors, and by the other, to vest them in the Commonwealth, is proof that this was not done by the 5th.
 
 
 40
 The inference to be drawn, as we think, from the 9th section, that the Legislature never lost sight of the distinction set up between manors and the general territory of the Commonwealth, is strengthened by the language of the 10th section, which provides and enacts, 'that, in order to preserve equality among the purchasers of land under the said late proprietaries, the said arrears of purchase money, other than for lands within the said tenths and menors, shall be accounted to be due and payable to the Commonwealth.'
 
 
 41
 Now, if the Legislature had supposed itself, by the preceding section, to have abolished all the arrears of purchase money due from lands within the manors, how would it 'preserve equality among the purchasers,' to coerce the payment of the purchase money for lands without the manors, to the Commonwealth? Or, what motive can be assigned for discharging those within the manors from paying for their lands, and requiring payment from those without the manors. It would be a caprice for which it would be impossible to account.
 
 
 42
 Where the language of the Legislature is clear, Courts cannot be permitted to assume an intention repugnant to that language, because it imports what they think unreasonable; but words are not to be forced out of their natural meaning, to produce what is unreasonable, if not absurd.
 
 
 43
 The plaintiffs in error also rely on the 6th section of the act establishing a land office, passed in 1781, as amounting, unequivocally, to a confiscation of the rights of the proprietary in the land in contest.
 
 
 44
 This proposition is sustained, by applying to all lands, words which are, indeed, general in themselves, but which are, obviously enough, used by the Legislature with reference to particular lands, the right to which was vested in the Commonwealth by the act of 1779.
 
 
 45
 This act does not purport to be an act of confiscation, but an act for opening a land office for the lands of the Commonwealth. It does not purport to be an act of acquisition, but of disposition of that which had been previously acquired. It commences with a recital, that 'many of the lands in the State, heretofore taken up,' &c., 'are yet unpatented, and the purchase money, and arrearages of purchase money, thereon due, are vested in the Commonwealth;' 'and the owners and holders of such rights, since the shutting up of the land office, have not had it in their power to pay in the purchase money and obtain patents: for remedy whereof, be it enacted, that an office be erected,' &c.
 
 
 46
 The subsequent regulations, then, respecting the payment of the purchase money, were intended for such purchase money only as was already vested in the Commonwealth; and the unpatented lands referred to, are those only, the purchase money due on which was then vested in the Commonwealth. It is important, too, in the construction of this act, to recollect that the framers of the act of 1779 could not have intended any interference, by means of a land office, or otherwise, with the manors. They remained the property of the proprietaries, who were themselves to receive the arrears of purchase money, and to complete the titles. The whole act being framed for the property of the Commonwealth, the general words of the 6th section must be understood to be limited to the subject matter of the act; that is, to the property of the Commonwealth.
 
 
 47
 The act directs, that patents shall be issued for lands for which the purchase money shall be received: and the 16th section directs, that the land, so granted, 'shall be free and clear of all reservations and restrictions, as to mines, royalties, quit-rents, or otherwise.' Now, the act of 1779 expressly reserves for the proprietors the quitrents within the manors. This act, then, cannot be construed to authorize the issuing patents for lands within the manors, unless it be also construed to be a confiscation, by implication, of property expressly reserved for, and vested in individuals, by a preceding act of the Legislature. This construction, to be justified, must be unavoidable.
 
 
 48
 But the 12th section appears to the Court to deserve some consideration. That section declares, 'that nothing in the act shall be construed to extend to lands, not granted in the usual forms of the land office.'
 
 
 49
 There were, then, lands in Pennsylvania, 'not granted in the usual forms of the land office.'
 
 
 50
 As this case comes on after a general verdict, on an exception to a charge given by the Court to the jury, it is incumbent on the person taking the exception, to show that the charge is erroneous. If it comprehended this act, of which the Court is not satisfied, still it is incumbent on the exceptor to show that lands within manors were 'granted in the usual forms of the land office.' This fact is not shown.
 
 
 51
 The act of 1783 is obviously limited to the same subject to which the act of 1781 applies. All arguments founded on this act are liable, too, to this additional objection. It was enacted after the treaty of peace, when the power of the State Legislature over the estate of William Penn, real and personal, had ceased.
 
 
 52
 We come now to that part of the argument which applies particularly to warrants issued on the common terms, for lands afterwards surveyed as a manor. It is contended by the plaintiffs in error, that such lands, though comprehended geographically within the lines of a manor, are not legally a part of it; and are not, therefore, either as to the land itself, or as to the purchase-money, saved to the proprietaries, under the act of 1779. The reservation in the 8th section of that act, is of "all the lands called and known by the name of 'the proprietary tenths, or manors,' which were duly surveyed and returned into the land-office, on or before the 4th day of July 1776."
 
 
 53
 It has not been suggested, that the lands which may happen to be held by common warrants, within a manor, are distinguished by a different appellation, and are "not called and known by the general name given to all the adjoining lands within the survey; but it is contended, that such are not brought within that part of the description which requires that they should be "duly surveyed." Although lands for which a conditional warrant had previously issued, be, in fact, surveyed as a manor, it is insisted, that such survey was not duly made. This is giving to the word "duly," a meaning which, in the opinion of the court, was not intended by the legislature.
 
 
 54
 The act of 1779 conferred no new right on the Penns, but left them in possession of their pre-existing rights, whatever they might be, within a described territory. It did not interfere with any controversy which might exist between Penn and others, within that territory, but left such controversy to be decided between the parties, as if the law had never been passed. The act is simply an adjustment between Penn and the Commonwealth. It refers to a fact of public notoriety, as marking the lines of division between them. That fact is, a survey, duly made and returned into the land office, before the 4th of July, 1776. The survey must be understood as one entire thing, describing the particular tract of country surveyed, and the words 'duly made,' mean, made according to the forms prescribed by law or usage. It was very well known, that, within these surveys, some lands were sold, and some were not sold. On all which were sold, quit-rents were received, and on some of them, the purchase money was still due. With the land, if not sold, with the quit-rents and purchase money, if sold, the Legislature, as has been already shown, declares its purpose not to interfere. There is nothing in the language, nor is there any thing in the character of the transaction, which would lead to the opinion that the Legislature intended to discriminate between the different rights of the proprietaries within the manors. The hand of government is not laid upon the manors, and all the rights of the proprietaries within those boundaries, whether to land, purchase money, or quit-rents, remain untouched. There can be no conceivable reason for supposing, that the Legislature meant to inquire into the dates of the warrants evidencing the sale of lands, while the right to sell was acknowledged, and to discharge one contract of sale within the untouched boundary, while another remained valid. The words make no such distinction, and we can perceive nothing in the nature of the property which will justify the Court in making it.
 
 
 55
 If we trace these words, 'manors,' and 'proprietary tenths,' to their first use, we shall find reason to confirm, not to change, the sense in which we suppose them to have been used in the act of 1779.
 
 
 56
 By the 19th section of the charter, license is granted to William Penn, and his heirs, 'to erect any parcels of land, within the province aforesaid, into manors.' There is no restriction on this power, which confines its exercise to lands which are vacant at the time. There was, then, no want of power in Penn to comprehend within a manor lands which were actually sold. The rights of the purchaser, the tenure by which he held his property, could not be changed, nor would they be changed, by including his land within the survey of a manor.
 
 
 57
 The proprietary tenths originate in the 'conditions or concessions agreed on between William Penn and certain adventurers and purchasers, on the 11th of July, 1681. The 9th condition, or concession, is: 'In every 100,000 acres, the governor and proprietary, by lot, reserveth ten to himself, which shall lie but in one place.'
 
 
 58
 Now, it is very apparent that, supposing this stipulation to be a fundamental law, and to enure to the benefit of all the inhabitants, it can only restrain the proprietary from reserving more than ten out of every 100,000 acres of land, and compel him to lay it off in one body. If within any survey of 10,000 acres, there should be some lands previously granted, the surveys would certainly not impair those grants; nor would those grants vitiate the survey. The respective rights of the parties would depend upon the law, which would decide that the purchaser would hold his land, on complying with the conditions of the purchase; and that, on his failing to comply with them, the proprietary might either indulge him, by giving further time, or might re-enter and hold the land, or re-grant it. In the event of re-entry, it can scarcely be contended, that this land would not be considered as a part of the proprietary tenth, provided it did not swell the amount of the reservation beyond the tenth which might be legally reserved. The including of lands previously sold, within a survey of a reserved tenth, as it would give the proprietary no new right against the purchaser, might sink so much of his reservation, but could produce no other question than might arise between him and the purchaser, respecting the validity of the sale. These are questions with which the legislature of 1779 manifested no intention to interfere. It will not, we presume, be doubted that the words "manors" and "proprietary tenths," have the same meaning throughout the act; that they always designate the same lands; that, when used in reference to quit-rents, they have the same meaning as when used in reference to the arrears of purchase money.
 
 
 59
 Now, it appears, from the statement of the testimony made in the charge of the court to the jury, which is the only regular information of the evidence given in the cause, that an agreement was entered into, in 1736, between the proprietary and a number of the inhabitants, by which he engaged to make them titles for certain specified quantities of land in their possession, on the common terms. This agreement is stated to have been afterwards carried into execution. The contract, as stated, contains unequivocal proof of having been made under the idea that the survey of 1722 was valid, that it related to lands within the lines of that survey, and that the land within its lines was considered as a manor. That survey may not have been attended with those circumstances which would bring it within the saving of the act of 1779, and, certainly, in this cause, is not to be considered as a valid survey of a manor. It was, nevertheless, believed, in 1736, by the parties to this contract, to be a manor; and those proceedings which took place respecting lands within it, are, consequently, such as might take place respecting lands within a manor. We find sales of land made to fifty-two persons, upon the common terms, and grants made to them according to contract. When the final survey was made, comprehending these lands as being part of the manor of Springetsbury, were they less a part of that manor because they were granted as a part of it before that survey was made? When, in 1779, the Legislature excepted from confiscation the quit-rents 'reserved out of the said proprietary tenths or manors,' is it credible that they intended to create a distinction, never heard of before, between the quit-rents on lands lying within the lines of the manor, and sold as part of the manor, to depend on the terms or the time of the grant?
 
 
 60
 The defendants in the Circuit Court gave in evidence, fifteen instances of lands lying within the manor being settled for on the common terms. Were these lands excluded from the manor by being so settled for? Did the Legislature of 1779, when about to save for the proprietaries the quit-rents reserved out of manors or proprietary tenths, or out of land commonly called and known by the name of manors or proprietary tenths, which were duly surveyed and returned into the land office, on or before the 4th of July, 1776, fix its mind on the survey to which reference is made, or on the dates and terms of the grants made for lands within the survey? If on the survey, then the language expresses the intention; if some other distinction was designed, it is strange that no words were inserted pointing to such distinction. The Legislature intended to confiscate the estates of the proprietaries in part, and in part only. The line of partition between the Commonwealth and the Penn family, was to be drawn. It was the province of wisdom and of justice to make this line a plain one. It was proper that the Commonwealth, and Penn, and the people of Pennsylvania, should be able distinctly to discern it. If the lines of the manors, as surveyed and returned in the land office, before the 4th of July, 1776, constitute the dividing lines between the parties, they are plainly and distinctly drawn. If some imaginary distinctions are to be made between the lands comprehended within those lines, or the quit-rents reserved on those which had been sold, the whole certainty of the division is lost, unless some other line, equally plain, equally rational, and equally justified by the words of the act, can be substituted. Is this practicable in the case before the Court? Extensive sales were made in a tract of country, supposed by the seller and the purchaser to be a manor. Other sales were made, containing in the contracts no intrinsic evidence that the parties understood the lands to be within a manor. The purchase money, in both cases, is paid, and deeds are made, reserving the usual quit-rents. To ascertain the real boundaries of the manor, to make a legal survey of it, if one had not before been made, a warrant of resurvey is issued, and a survey made and returned into the land office, comprehending both these classes of lands, with others which were at the same time vacant, as being within the manor. When the Legislature saves to the proprietaries the quitrents out of lands sold within the manors, can a distinction have been intended between those lands which were sold as part of the manor before, and those which were sold after the resurvey? If it be assumed, where the warrants contain no evidence of being intended for manor lands, that the parties or the proprietaries were ignorant of their being comprehended within a manor, what difference, in reason, can this make? The lands were equally liable to quit-rents in the one case and the other. They were equally within a manor, whether known or not known to be within it. Could the Legislature have a motive in the one case more than in the other, for abolishing these quit-rents? If the motive existed, it would be shown in the language adopted. But the search for it in the language of the Legislature, would be as fruitless as in the reason of the case. The Court cannot sep up this distinction.
 
 
 61
 If the word manor, when used as describing territory within which quit-rents are saved, comprehends lands sold before the resurvey, then the same word, when applied to the arrears of purchase money, retains the same meaning.
 
 
 62
 It has been urged in argument, that the Legislature intended clearly to distinguish between the rights of Penn, as an individual, and his rights as proprietor. The first were reserved; the last were confiscated. This distinction, so far as respects the subject of the present controversy, is not to be found in the law. The 8th section confirms to the proprietaries all their private estates, 'and likewise all the lands called and known by the name of the proprietary tenths or manors.' These proprietary tenths or manors, then, did not compose a part of, but were in addition to, their private estates. They were held too by precisely the same title by which other lands in Pennsylvania, not sold nor reserved, were held Nor was there any new modification of that title. They were withdrawn from the mass of property offered for sale on the common terms; but were still held by Penn, solely as proprietor under the charter. The quit-rents, too, were clearly an appendage to the original grant, retained on the lands which were sold, and retained by Penn in his character as proprietor. Yet these are expressly saved to him. There is, then, in the act of 1779, no intention to make the private and proprietary rights of Penn the criterion by which the line of partition between him and the Commonwealth should be ascertained; but there is a clear intention to divide his proprietary estate, and to make his surveys of manors the criterion by which this line of partition should be ascertained.
 
 
 63
 This result is, we think, very clearly produced, so far as respects the soil, by the 5th and 8th sections; and is, we think, produced not less clearly with respect to the arrears of purchase money, by the 9th and 10th sections. Strike out those sections, and there is nothing in the act which can reach the arrears of purchase money, within or without the manors. They would, like other debts, remain the property of the creditor. The 9th section expressly abolishes 'the arrearages of purchase moneys for lands not within the tenths or manors aforesaid;' and if, as we think, the tenth, or manor, was in the minds of the Legislature, described by a survey thereof, made according to law or usage, and returned into the land office before the 4th of July, 1776, then the lands on which the arrearage of purchase money is claimed, in this case, are within one of the aforesaid tenths, or manors.
 
 
 64
 We think, then, that the lands, or the purchase money, which the plaintiffs in the Circuit Court claim in this case, are not confiscated by any act of the State of Pennsylvania.
 
 
 65
 Before we take leave of the act of 1779, it may be proper to inquire, whether it has any operation on the lands lying within the manors, and which had been sold, but not granted, the terms of sale not having been complied with. It will be recollected, that those on whose property this law acted, were the subjects of an enemy, and that the Legislature possessed full power over their estates. Having the power to confiscate absolutely, they might modify that power in its exercise, as to them might seem proper. The 7th section provides and enacts, that all the rights, &c. which were derived from the proprietaries, or to which any person other than the said proprietaries were entitled, 'either in law or equity,' by virtue of any deed, patent, warrant or survey, of, in or to any part or portion of the lands contained within the limits of this State, or by virtue of any location filed in the land office before the 4th of July, 1776, shall be, and they are hereby confirmed, ratified, and established for ever, according to such estate or estates, rights or interests, and under such limitations or uses as in and by the several and respective grants and conveyances thereof are directed and appointed.
 
 
 66
 This section comprehends all the lands within the State, whether within or without the manors, to which any individuals had derived a title from the proprietaries, either in law or equity, by virtue of any deed, patent, warrant or survey, and confirms such title according to the estate, right or interest conveyed. That the section operates alike on lands within and without the manors, and that it confirms titles under warrants or surveys, for which the purchase money has been paid, are certain. It is equally certain, that it does not interfere with the arrears of purchase money which may still be due, because that whole subject is taken up and disposed of in the 9th and 10th sections of the act. The doubt is, whether it has any influence on any lands, the purchase money for which had not been paid; and if any, how it affects the title to such lands.
 
 
 67
 The right of re-entry was reserved as a security for the payment of the purchase money, but does not appear to have been exerted, and was probably considered in the light of a mortgage, to be used merely as the means of enforcing the fulfilment of the contract, not as absolutely terminating the estate. That the proprietaries looked on for a great number of years, and saw lands held under warrants void on their face, for the failure to fulfil the contract within the specified time of six months, and never, in a single instance, so far as appears in the case, or has been alleged in argument, attempted to avoid the estate, would certainly, afford a strong equity to such purchaser against the proprietary, should such an attempt be made. And that ejectments were maintained on such titles, is also evidence of the opinion entertained of them in the Courts of Pennsylvania. It seems to have been understood by all, that the proprietary was to avail himself of the condition in the warrant, for no other purpose than to coerce the payment of the purchase money. This became, from usage, a kind of tacit agreement, which their real interest required all parties to observe. Yet, when a new state of things was introduced, it was natural for that numerous class of purchasers, who had not paid up the whole of the purchase money, to be uneasy at the hazard in which their titles were involved; and their representatives would very naturally feel disposed to quiet their minds on this interesting subject. It would not be unreasonable, to suppose the existence of a disposition to make the contract expressly what it was understood to be, and to do away the forfeiture, except as a mode of enforcing payment of the arrears of purchase money. The confirmation of titles, by their own terms void, for non-payment of the purchase money, accompanied with the preservation of the right to the purchase money, admits of the construction, that the clause of forfeiture may be used to enforce the payment of those arrears, but not as extinguishing the estate. At all events, this section has the same application to lands within, as to lands without the manor; and the construction it has received with respect to the one, may serve as a rule for the other.
 
 
 68
 The next exception to be considered, is to that part of the charge, which declares the act of 1705, commonly called the seven years law, to be inapplicable to the case. That act enacts, 'that seven years quiet possession of lands within this province, which were first entered on upon an equitable right, shall for ever give an unquestionable title to the same against all, during the estate whereof they are or shall be possessed, except in cases of infants,' &c.
 
 
 69
 It has been contended, that this act is merely retrospective; and, in support of this opinion, it has been said, that for more than one hundred years it has never been resorted to in the Courts of Pennsylvania.
 
 
 70
 To this argument it is answered, that the language of the act is prospective, that it purports to be an act of limitations, that it is found among the printed statutes of Pennsylvania, and that its operation has never been denied, so far as we are informed, in any of the Courts of that State. During the irregularities which take place in the first settlement of a country, an act of limitations is peculiarly desirable, and it would be strange if Pennsylvania should have remained entirely without one. The 16th section of the laws agreed upon in England, enacts, 'that seven years quiet possession shall give an unquestionable right, except in cases of infants,' &c. An act of the same import as to possession, without any exception in favour of infants and others, was passed in 1700, but was repealed in England, in 1705, in which year the act was passed which is now under consideration. The people of Pennsylvania had one uniform and constant wish on this subject. Neither the 16th section of the laws agreed on in England, nor the repealed act of 1700, can be considered as retrospective; and there is some difficulty in giving this construction to the act of 1705. But, the Courts of Pennsylvania having never considered this act as having the effect of an act of limitations, this Court is not inclined to go further than they have gone. If, however, it were to be so considered, it must be governed by those rules which apply to acts of limitation generally.
 
 
 71
 One of these, which has been recognised in the Courts of England, and in all others where the rules established in those Courts have been adopted, is, that possession, to give title, must be adversary. The word is not, indeed, to be found in the statutes; but the plainest dictates of common justice require that it should be implied. It would shock that sense of right which must be felt equally by legislators and by Judges, if a possession which was permissive, and entirely consistent with the title of another, should silently bar that title. Several cases have been decided in this Court, in which the principle seems to have been considered as generally acknowledged;[3] and in the State of Pennsylvania particularly, it has been expressly recognised. To allow a different construction, would be to make the statute of limitations a statute for the encouragement of fraud—a statute to enable one man to steal the title of another by professing to hold under it. No laws admit of such a construction.
 
 
 72
 The true question then is, whether the occupancy of those who held under these conditional warrants, was consistent with, or adversary to, the title of the proprietaries? Upon the answer to this question, it seems difficult to entertain a serious doubt. It is reasonable to suppose that the practice of selling lands on credit, and of issuing warrants in the form of that which is inserted in this case, and of holding the legal title to secure the payment of the purchase money, prevailed from the first proceedings under the charter, until the declaration of independence, a period of near one hundred years. In the particular case before the Court, credit was given from the year 1742; and we are not informed, and, consequently, have no reason to suppose, that this indulgence was singular. The legislation of Pennsylvania on the subject, justifies the contrary opinion; for we perceive among their printed statutes, several of a late date, giving farther time to pay in the purchase money for lands sold before the 10th of December, 1776. These acts of farther indulgence, continued for such a length of time, furnish strong evidence that the cases were very numerous to which those acts would apply; and show, too, that in the opinion of the Legislature, no act of limitations had barred the claim. Now, this practice, in which the proprietaries, and a great portion of the population of Pennsylvania, concurred, is incompatible with the idea that the title of the purchaser became adversary to that of the proprietary, within six months after the date of the warrant of survey. In the case before the Court, the survey was made, in fact, upwards of five years after the date of the warrant. It is conceivable that the surveyor, who was an agent of the proprietary, would have made the survey, had he supposed it to confer a title adversary to that of his principal? a title which would enable the holder, by remaining quiet only one year and three months longer, to set the proprietary at definance, and to hold the land discharged from the contract by which it was acquired. The very practice of holding back the title, and of giving such extensive indulgence for the payment of the purchase money, seems to demonstrate a general opinion, that, so long as this state of things continued, the title to the land was still in the proprietary, and the purchaser acknowledged his title. The occupation of the purchaser was with the consent of the proprietary, and, consequently, not hostile to his rights. The proprietary permitted the purchaser to hold the land, subject to his claim to the purchase money; and the purchaser held under the admission, that the land remained liable to the purchase money, and that the proprietary might, at any distance of time, assert his title to it, so far at least as to secure his purchase money. There seems to have been a mutual understanding and a mutual confidence between the parties. How far the proprietary may have had it in his power to violate this confidence, by seizing the land, and refusing to convey it on a tender of the residue of the purchase money, is a question which does not appear ever to have been determined, or ever to have occurred. But, certainly, during this state of things, the purchaser could not be considered as holding a possession adversary to the title which he acknowledged.
 
 
 73
 It has been contended, that the survey of the manor was a determination of the estate under the warrant, and the assertion of an adversary title, from which time the act of limitations began to run.
 
 
 74
 There is certainly nothing in the fact itself, which supports this proposition. All the transactions of the parties contradict it. There is no fact which shows a disposition in the proprietary to reenter on any lands for which a warrant had previously been granted; nor is any case of such reentry shown, from the first settlement of Pennsylvania. Several instances are mentioned, of grants completed on the common terms, within the manor of Springetsbury, while it was considered by the parties as a manor. 'No inference, then, is to be drawn from the facts in the case, favourable to the conclusion, that the survey of a tract of country as a manor, was considered as determining the estates created by surveys on warrants previously issued, the conditions of which had not been fulfilled by the purchasers. This must be a conclusion of law, from the single act of survey, so inflexible as not to be influenced by the intention with which that act was performed, and the opinion prevailing at the time, as attested by usage, or the argument cannot be sustained.
 
 
 75
 But how is this conclusion of law to be supported? The survey of a large tract of land cannot be considered as an entry on a smaller tract within its lines, as an ouster of the occupant, or even as a trespass on him. How, then, can such survey be considered as having any legal effect different from the intention with which it was made? It is indispensable to the argument, to maintain that the mere act of survey does, of itself, in point of law, show an intention inconsistent with the continuance of any conditional estate, within the limits of the manor. This the plaintiffs in error have endeavoured to maintain; and for this purpose have contended, that a new title, which they call the 'manorial title,' and which they say is distinct from the proprietary title, was created by the survey: that the plaintiffs in error hold under the proprietary title; the plaintiffs in ejectment, under the manorial title. Their claims are, consequently, adversary to each other.
 
 
 76
 But this argument cannot be reconciled with the fact. No new title was created by the survey. There was no source from which title could be derived, other than from the proprietary himself. The survey was, not to give a new title, but to separate a certain tract of land from the general mass, which was offered to every adventurer. The effect of this survey was, not to avoid contracts already made, but to give notice to the public, that these lands were thereafter to be acquired by special contract only. The act of 1779 found this to be the existing state of things; and, in dividing the estates of the proprietaries between the Commonwealth and the former owners, adopted the lines of the manors as the lines of partition between them. This created no new title, but left to the proprietaries their former title, within the described boundaries.
 
 
 77
 We perceive, then, nothing, either in the law or the fact of this transaction, which tends to show that the possession of the plaintiffs in error has been adversary to the rights of the person under whom he originally claimed.
 
 
 78
 Having considered the act of 1705 as if it were an act of limitations, all the reasoning which has been applied to that act, applies also to the act of 1785, on which the 8th exception is founded. The several treaties formed with Britain, have a very important influence on the time which has elapsed since the war between the two countries.
 
 
 79
 The opinion that the plaintiffs in ejectment have still a right, notwithstanding the acts of 1705 and 1785, to proceed at law, presupposes their consent to the continuance of the original title, created by the warrant; for if the possession taken under the warrant or survey was not continued with the consent of the proprietary, it immediately became adversary, and the act of limitations immediately commenced. If, then, there be any case in which this assent is not to be presumed, that is a case in which the plaintiff in ejectment is barred by the act of 1705 or 1785.
 
 
 80
 If, as the Court thinks, the rights of the proprietaries were converted, by long acquiescence in the usage which must have been known to them, of selling the lands, as being liable only for the purchase money; or, by the 7th section of the act of 1779, or by both united, into a mere right to the purchase money, still the remedy of proceeding against the land for the purchase money remains, and is not taken away by the act of 1779. That act, having reserved the purchase money for the proprietor, must, of course, be construed to reserve his remedy, unless it was expressly taken away. It is not easy to point out any other remedy than this, by ejectment. The original purchaser has transferred; and were his representatives even still liable for the purchase money, which is far from being admitted, they may not be able to pay it, if they could be found. It was not on their personal responsibility, but on the land itself, that the vendor relied. His claim was attached to the land, and passed with it. The remedy reserved is on the land, not on the person. It would be difficult to form an action at law against the person; and in Pennsylvania, there is no Court of Chancery, even if a bill in equity could be sustained. The remedy must be by ejectment.
 
 
 81
 There are other exceptions in the record, which, though not pressed, have not been waived. It was, therefore, the duty of the Court to examine them. The result of that examination is, that the only serious questions in the cause are those which grow out of the acts of 1705 and 1779. These having been rightly decided, there is no error, and the judgment of the Circuit Court is affirmed.
 
 
 82
 Mr. Justice JOHNSON, dissented.
 
 
 83
 The reasoning upon this cause, must be utterly unintelligible to those who hear it, unless premised by the following state of facts:
 
 
 84
 The grant to William Penn, vested in him and his heirs, both the soil and sovereignty of the State of Pennsylvania, subject to a few reservations of right and power, not material to be noticed here. But, before his colony took their departure from England, he entered into a variety of stipulations, restricting the exercise of both his power and rights over the territory which they were about to occupy. These are known by the epithets of his conditions or concessions; and it is by one of the articles of this instrument that he precludes himself from setting apart more than one tenth of the soil, for the several and individual use of his family. The rest was to be granted out to settlers, on terms which were to be common to all except those who purchased within the proprietary tenths, with whom he was at liberty to contract as he pleased for the sale of his lands.
 
 
 85
 By the 17th section of the charter, there was power given to the proprietary to erect manors, with right of court-baron, frank-pledge, &c., and to grant the land therein for estates, which the grantees could not devest of the incident of being held directly of the manor, or the grantee of the manor, who is denominated lord of the manor. The manor of Springetsbury, within which this land lies, was surveyed for the use of the proprietaries, and surveyed as a manor. There was evidence in the cause below, of its having been laid off as early as 1722, but it was certainly resurveyed in 1768; and as the Court below rested the case upon the effect of the resurvey, as equivalent to an original appropriation, I presume the case does not require that we should look beyond it. The titles under which the defendants below (and plaintiffs in appeal,) defend their possession, originated in 1747 and 1748, and would be entitled to unquestionable precedence, but for the following facts: The warrants of survey contain a condition in these words, 'which survey, in case the said A. B. fulfil the above agreement within six months from the date hereof, shall be valid, otherwise void.' The agreement here referred to was, to pay a sum of money, (called, with reference to its fixed amount, the common terms,) in six months. A portion, about one third, of this sum, it appears, was paid, but there was nothing in the cause to sustain the payment of the residue, unless it was possession, lapse of time, and supposed acquiescence of the proprietaries. When the manor was surveyed in 1768, there were many of these individual land-holders comprized within the lines then laid off, all holding on the common terms; and there were, afterwards, many other tracts sold, upon what are called, in the peculiar language of that country, the terms agreed; by which is understood, according to a value to be adjusted, without confining the vendor to the common terms. Such tracts were sold out to the purchasers of this class, as Penn's individual property. Upon all these lands there were reserved a small annual sum, called quit-rents. In the year 1779, the Legislature passed an act, entitled, an act 'for vesting the estates of the late proprietaries of Pennsylvania in this Commonwealth,' by one section of which, the proprietary tenths, or manors, are granted to the proprietaries, 'together with the quit-rents and other rents reserved thereon.' By another, all the lands of the State, except those within the tenths or manors, are exempted from quit-rents, and released from any lien for balances of purchase money, which purchase money is vested in the Commonwealth.
 
 
 86
 The question is, whether the lands within the manors, granted out to individuals previous to surveying the manors, are entitled to the benefit of these exemptions, in common with all lands of the same class within the State; and the action below is an attempt to exclude from that benefit those prior grantees, under the idea that they are excepted by the effect of the reservations in favour of the proprietaries. And this supposed right of the proprietaries is asserted through the medium of an action of ejectment, under the idea that the legal estate is in the grantee of the manor, and only an equitable interest in the tenant, the prior purchaser.
 
 
 87
 The received doctrines on the subject of what creates a legal estate in a grantee, it must be observed, are altogether peculiar in the State of Pennsylvania. A warrant, a survey, and payment of the consideration money, is held to give an absolute estate in fee, though not consummated by a patent. This subject came on to be considered by this Court, as early as the year 1799; and the law was then clearly recognised to be as I here state it. Judge Iredell uses the expression, as applied to a title so acquired, 'a legal title, as distinguished from an equitable title.'The peculiarities of the form in which this question comes up, must be attributed to local practice. The charge given by the Court, on summing up to the jury, is copied into the record, and exceptions taken to those parts of it which were unfavourable to the defendants below. These exceptions were ten in number; but only the 4th, 7th, 8th, and 10th, have been insisted on in argument here. Of these, I consider the last in numerical order as proper first to be noticed. It is expressed in these words: 'Because the evidence exhibited manifested the absence of legal title in the plaintiff's lessee, whereas the Court charged the jury, that he was possessed of the legal title, and as such, entitled to recover in this action.'
 
 
 88
 The Court below has considered the title of the defendants below as a mere equitable title; all its conclusions, from first to last, have their basis in this doctrine. And had it been shown in argument that this idea was sustained by a course of decisions in the State Courts, I certainly should not feel myself at liberty to contest it. But every thing conspires to satisfy me, that the estate vested in the warrantee upon the execution of a survey, was never considered in any other light than a legal estate, in the jurisprudence of that country. Whatever may be the correct legal construction of the words of the warrant, if such has been the practical construction, communis error facit jus, and it is now too late to criticise on the meaning of terms.
 
 
 89
 My reasons for adopting this opinion are the following:
 
 
 90
 1. I look in vain through the statutes of that State, for any legal provision for entering, avoiding, and regranting lands, for failure in paying the arrears of purchase money. On the contrary. I find an act passed on the 9th of April, 1751, which furnishes a legislative exposition of the law on this subject. By the provisions of that act, the treasurer is authorized to issue an execution for the arrears of purchase money due on lands granted prior to the 10th of December, 1776, and to levy on and sell the land so granted. That the warrants and survey created in favour of the State a debt and a lien, is unquestionable; and this is all that the State affirms in passing this law; but, by the same legal provision, it negatives the idea of the property in the soil having ceased to exist in the tenant. No change in this respect was effected by the act of 1779, commonly called the vesting act, since that act only confirms individual estates according to their existing qualities.
 
 
 91
 Nor has the legislative power been altogether silent on the subject of forfeiture and regranting: for, by the 10th article of the concessions, there is provision made for regranting lands which may become forfeited for failing, for three years, to seat and improve them. Nor do I believe that there can be produced in the history of the jurisprudence of that country, an instance in which this power of regranting has been extended to any other case.
 
 
 92
 2. I think this opinion follows as a corollary to the proposition, that payment of the consideration money vests a legal estate. For why should a patent be unnecessary, if there remained any act to be done on the part of the proprietary, in order to pass a legal estate? It may be contended, that this doctrine results from the peculiar jurisprudence of that State, in which, for want of Courts of equity, the Courts of law have adopted the maxim, that we must consider that as done which ought to be done. But to this there is a brief and unanswerable reply. Such might be the reason where a patent is demanded, and the fees tendered; but such demand and tender have never been insisted on as necessary in support of the general effect of payment of the consideration money, to vest a fee simple absolute, without a patent.
 
 
 93
 Some analogy may be supposed to exist between this case, and that of mortgagor and mortgagee. But, if so, the relation is reversed, and the converse of the rights and liabilities of the mortgagee results from it. For, the debtor conveys the fee to the creditor, in the ordinary form of mortgaging, and retains only the right to redeem. Here the creditor conveys the estate cum onere. And the question as to the interest vested in the defendants below, whether it was legal or equitable, still recurs. If legal, it bears an analogy with an estate in fee subject to a charge, rather than to an estate subject to a mortgage; in which former case, the creditor could not maintain ejectment.
 
 
 94
 The only analogy, in my judgment, between this estate and any one known to the common law, is that of a feoffment on condition. The warrant is the deed, the survey the livery of seisin, and the condition is a condition in deed, as distinguished from a condition in law; and it is also a condition subsequent. In which case, it is clear, that the estate is a legal estate, and remains good until entry made for the forfeiture, by some one legally authorized. This leads to the questions, whether, previous to their formal entry on bringing this ejectment, such an entry was made? Whether legally made? And what were its legal effects?
 
 
 95
 Unless the manorial appropriation of 1768 can be considered as an entry, it is not pretended that any legal eviction of the defendants below ever took place. And as to that, I think it perfectly clear, that it could, on no principle, operate as a legal eviction. It was an act, on every principle, perfectly consistent with the full and unmolested enjoyment of the premises in question. And this consequence follows, whether we consider it in the light of a simple designation of metes and bounds, over which the original proprietary rights were retained, or, what appears to be the more proper view, as an original grant, converting it from an interest existing in the proprietary, in his political capacity, into an estate held by him in his individual relations to the society, of which he was both a member and a ruler. In the first view, there was no sensible change made in the estate, as it existed previously in this, and the whole territory; and in the second, the interest acquired, or effect produced, could be nothing beyond that of a grant to any individual, other than the proprietary. In the latter case, it is perfectly clear, that running the circumscribing lines, would be no trespass or eviction. These appropriations to the proprietary, were intended to operate exclusively upon unseated territory. On that which had been previously surveyed to individuals, they could produce no effect whatever; otherwise they might as well have dispossessed those who held by a perfect, as those who held by an inchoate title. Although circumscribed by the lines of the manor, the seated tracts composed no part of the thing appropriated; they could not have been estimated as any part of the proprietary's tenths; and there never was a doubt of his right having still existed, to extend the limits of his survey, so as to take in as much land as he was deprived of by these prior included individual appropriations. A different construction would be greatly to his prejudice, inasmuch as he might, by possibility, have lost the whole of his tenths, by taking in the grants to others. This view of the subject, I shall again have reason to recur to, on another point.
 
 
 96
 But, if this circumscribing survey could, on any principle, be held equivalent to an entry, it is still necessary to maintain that it was a legal entry. And this I am prepared to negative, upon various grounds. It is obvious, that such an entry must be justified, either on the ground of personal right of legal power. A mere arbitrary power to resurvey, did not exist in the proprietary; the province of Pennsylvania had taken the form of a State, governed by a wise and beneficient government, in which the will of the proprietary had been subjected to the public will, and his allodial interests circumscribed to his purchase money and quitrents, and his reserved tenths. As to the land seated under warrants to individuals, he was bound by his own concessions and the legislative will; and I see no power delegated by law to any one to enter and evict for failure to pay the consideration money reserved on such appropriations; nor have we been told of any practice on this subject, that could be construed into a national acquiescence, in the exercise of such a power. The debt and the lien remained, but the right of eviction and regranting for non-payment, was never legalized nor asserted, nor could it, in any case, have been tolerated, without a tender of that part of the consideration money which had been already paid. Again, an entry for condition broken, must be made as such, and with intent to produce the legal effects of an entry; a mere casual friendly passing of the boundaries of the premises will be unconsequential; but here, the sole object of the survey of 1768, was to appropriate unseated land, and not to assert a title to that which had been previously appropriated. The present claim is but an after thought; a speculation upon the possible effect of an act not intended to produce eviction.
 
 
 97
 This leads to another consideration, operating against both the fact and legality of this supposed entry, for condition broken. It is agreed, on all hands, that proof of the full payment of the consideration money, would have been conclusive against the title of the plaintiffs below. But why may not presumption of such a payment arise from length of time and acquiescence? and that of the plaintiff below be left as a fact to the jury? If resumption of a patent may, under circumstances, be left to a jury in favour of possession, much more so may a fact so much less solemn in its nature, and more difficult of proof, as payment. In this case, and in all cases arising in Pennsylvania, such a fact may well be submitted, since in practice it has superseded the issuing of a patent, and may well tempt the parsimony of purchasers, since the expense of a patent has become an expense of supererogation. The long forbearance and acquiescence of the proprietaries, can be referred only to one of three causes: a consciousness that they had acquired nothing in the seated lands within their manorial appropriations; that they had no right to enter on the premises previously seated; or, that the title in it was perfected by payment. All which would operate against both the fact and legality of the supposed entry.
 
 
 98
 From these considerations, I am led to adopt the opinion, that the title of the defendants below was a legal title, and the better title; that if voidable, it could be avoided only by entry for conditions broken. That no such entry was made, or was intended to be made, or could be legally made; and that they were, therefore, entitled to a charge in their favour. With this view of the subject, it may not be necessary for me to go farther. But it comports with the practice of this Court, that I should express an opinion on the other points in the cause.
 
 
 99
 And first, as to the bearing of the act of confiscation, on the subject of this suit.
 
 
 100
 The Court below appears to have considered a manor in the light of a geographical tract, or portion of territory designated by metes and bounds. I, on the contrary, consider the term as designating an estate or legal interest within the geographical limits. In this sense, nothing will be comprized in the meaning of the words of the 8th section of the law, but those tracts of land within those limits which were held of the manor; or, in the peculiar language of that country, granted on terms to be agreed. It is very clear, that the 8th section of the act of confiscation was not intended to convey to the proprietaries any interest not previously existing in them. Now, how did a manorial appropriation operate upon the lands that had been seated previous to such appropriations? It is clear that it vested no interest in such lands, nor any thing incident to them. If the whole purchase money had been paid, the individual's estate was consummated. And if the whole was not paid, it is admitted in the charge, that the proprietary could not change the tenure or the terms of purchase. And so far were these previously seated tracts from being considered in law as making part of the manor, that the proprietary's right to indemnify himself from adjacent unseated territory, for the deduction from his tenths, caused by these excepted tracts, has been solemnly recognised in that Court. Then, though within the manor, they were not of the manor; as well might an island or an oasis be denominated water or desert. And there were unanswerable reasons, in justice and policy, why such land should have been so considered. It is asserted that the proprietaries never, in fact, exercised any of those privileges and powers within the tracts denominated manors, which were authorized by the charter. But this consideration has no influence upon my opinion; for, 1st, I see no reason, except the intervention of the revolution, why the proprietaries, or lords of the manors, may not have assumed the exercise of those privileges. In case of escheats, there can be no doubt that they would have asserted one manorial right, and were probably prevented from asserting all, only because in the actual state of the province, they would have been burthensome, and unproductive. But, 2dly, They did assert one important privilege within those limits, a privilege which they were precluded by law from exercising beyond those limits. This was the right to demand a higher price for the lands within their manors, than that to which they had restricted themselves in the State at large. And this appears to me to establish a familiar and definite ground of discrimination, by which to determine the operation of this act of confiscation, in any given case. Was the land held on the common terms, or the terms agreed? It cannot be disputed that the general purpose of the act of confiscation was, to distinguish between the land appropriated to the individual use of the proprietaries, and that over which they were held to exercise only a political power, or fiduciary interest. They were permitted to acquire an individual property in one tenth of the territory of the State; and the lands so appropriated, as well as the proceeds of the sale of such lands, were meant to be set apart to them, while that which had been seated by individuals, as a part of the unappropriated nine tenths, reserved to the community, was intended to be confiscated. Any other construction would go to imply, that the State had reserved to the proprietaries, territory which was no part of their legal tenths; and, also, that but for this reservation, the act of confiscation would have devested individual interests not intended to be confiscated.
 
 
 101
 But let us examine more paticularly the provisions of this act, with a view to determining its just construction. And here let me premise, that, for all the purposes of this suit, I care not whether the 9th section of the act vests in the proprietaries the balances due on the tracts within the manor, sold on the common terms, or not. The question here is, whether they are entitled to judgment in a suit in ejectment, and of consequence, to a writ of possession, for I cannot distinguish the one from the other. I wholly reject the doctrine of suing for possession, and recovering money; of suing for land, and recovering pounds, shillings and pence. Such a perversion of means might proceed from positive legislation; and, in the State of Pennsylvania, where an amalgamation of law and equity necessarily grows out of the want of an equity jurisdiction, the practice has grown up, of giving an alternative judgment in such cases, for either the land or the money, or rather for the money to be levied on the land. But this Court is expressly prohibited from thus confounding legal and equitable proceedings, and the whole opinion of the Court below proceeds on a recognition of the necessity of pursuing the two classes of legal and equitable rights, by their appropriate remedies. I have said, and in this I do not understand myself as differing from this Court, that the only practical effect of the terms of the warrants to individuals is, to create a debt and a lien; but surely a tenant may covenant to stand seised, subject to a charge in gross, and yet retain the legal estate. And even in the ordinary case of a mortgage, where the legal estate passes from the debtor to the creditor, and the converse of the present case exists, an assignment of the debt is no conveyance of the legal estate to the assignee. A Court of equity will pass the one as an incident to the other; but in a Court of law, the assignee could not maintain ejectment. And that is the only question here. If it be said, that although in this suit the plaintiff below may not be entitled to recover the land, but may avail himself of this form of action to recover the purchase money due, I consider it as an abandonment of the question; for, the debt, if existing, was but an equitable lien, and the remedy here resorted to, is a common law remedy. I think, however, I shall show, that although the debt exists, the lien is taken away by the act of confiscation; and though the debt be due, it is not due to these parties, but to the Commonwealth of Pennsylvania.
 
 
 102
 In following this act of confiscation through the detail of its provisions, we find, that after four sections, setting forth the views and motives of the Legislature, the fifth section, or first enacting clause, contains a general assumption of the soil and sovereignty of the State, and a revocation of the charter to Penn, as fully, to use its own language, 'as if the same were therein transcribed and repealed.' The sixth section asserts the future exclusive appropriation of the 'soil and lands, hereditaments and premises, to be in the Legislature of the State;' and, under the operation of these two clauses, it is very clear, that every right, civil and political, of the proprietaries, 'of, in, or to the soil' of Pennsylvania, derived under the charter, was (subject to the exceptions in the same act) vested in the Commonwealth, 'freed and discharged,' as the act expresses it, 'from and against all estates, uses, trusts,' 'charges, incumbrances, titles, claims, and demands whatsoever.' And all the title which they now hold therein, they hold by virtue of the provisoes contained in the 8th and 9th sections. But to understand the force and meaning of those two sections, I deem it material, that the language and effect of the 7th section should be duly weighed. This section contains a general confirmation of all the estates, legal and equitable, derived from the proprietaries, their officers, &c. or otherwise, or to which any person or persons, other than the proprietaries, were entitled, either by deed, patent, warrant, or surveu. on the 4th of July, 1776. This clause operates in favour of all persons 'other than the proprietaries,' and confirms, unquestionably, the estates of these defendants below, in common with every other citizen. The next proviso, (8th section,) is confined to the subject of the estates and interests of the proprietaries. And here it is obvious, that three subjects claimed the attention of the Legislature. Their estates and interests were distributable into three classes: they held property acquired, in common with every other individual, 'by devise, purchase, descent,' &c.; they held other property, under the reservation of a tenth of the soil, to their individual use; and they held, or claimed, a third class of interests, as proprietaries, which clashed with that eminent domain, which was now about to be assumed by the State of Pennsylvania. The latter, the State determined to confiscate, and compensate them for; the former two, to preserve to them unviolated. And these considerations draw a line of demarkation between the subjects of this act, infinitely more definite and rational, than that marked out by trees or streams. The estates held upon the common terms, were those which constituted the third class; and the phraseology of the act appears to me to be in perfect accordance with the general intent. On this point, I hold it to be an important fact, that, without exception, throughout these two sections, tenths and manors are never used apart; they are constantly considered synonimous and equivalent. Now, although a manor may, by common acceptation, be considered as a geographical section, a tenth is a term of comparison and quantity, and has direct relation to that interest which the proprietaries had acquired, and might acquire, as a distinct individual property in the soil. I consider, therefore, both manor and tenth, as here used, as designating estate and interest, and not geographical limits. And why should it be held a reservation, by geographical limits? Let it be remarked, that it is no immaterial question to the defendants in the Court below, not only as it affects their interests, but as it affects their claims upon the justice and impartial legislation of country. There can be no reason assigned, why they should be excluded from the benefits which this act confers upon citizens of their class, and, in fact, subjected to confiscation. There are important interests growing out of this act to all other landholders, upon common terms; they are exempted from quit-rents, and the lien for the balance of purchase money is taken from off their lands. Can there be a reason assigned, why those of this class who, by the caprice or cupidity of the proprietaries, or their agents, have been embraced within the lines of their surveys, should be excluded from the common benefits extended to their fellow citizens? The injustice of such a discrimination is conclusive on the construction of thea ct, if an act is to be construed according to the intent of the Legislature. With regard to those who held of the manor, or held, as is usually said, on terms agreed, the case is widely different. It is the effect of their own individual contracts with the proprietary. They are, by the nature of their relation to the proprietaries, distinguished from those of the other class, and have nothing to complain of. Their quit-rents and arrears were considered as debts due to their landlord, and the Legislature intended to take from the Penns nothing which belonged to them in their individual capacity.
 
 
 103
 Again; extending the construction of the act to the geographical limits of the manor, leads to the most absurd consequences.
 
 
 104
 It has been insisted, that it was lawful, in surveying the manors, to include within their boundaries the grants to individuals. This is readily conceded; and the inference from the fact, is directly the reverse of what has been attributed to it. Did the Legislature mean, by the proviso in favour of the Penns, to reserve to them their legitimate tenths; or did they mean, by possibility, to reserve to them half the State? There cannot be a doubt that, although any particular survey had embraced half a county, yet if the vacant land within it had amounted to no more than a tenth, the appropriation would have been duly made, and valid. But could the Legislature ever have intended to exclude all the individuals thus circumscribed, from the common benefits of grantees on the common terms? to have subjected them to the most odious and unmerited exceptions? Could the State have intended to permit the proprietaries, under the pretext of surveying a tenth, to cast their net over half its limits? It was for the very reason that including individual surveys made them no part of the manor, that the right to include previous locations to individuals was tolerated. It had not entered into the mind of man to conceive, that they thereby produced any change in the relation which subsisted between those individuals and the Commonwealth; or could expose them to be separated from the mass of the community, in the several legislation of the State; or exclude them from an equal participation in all the benefits of the revolution. But by this geographical construction, without any act or offence on their part, they are shut out from immunities extended to others, who had no greater claims upon the community than themselves.
 
 
 105
 But again; if we are to construe this act without a reference to its general spirit and intent, we have but to carry the principle through, in order to involve us in irreconcilable absurdity, and such as will oblige us, for the purpose of common sense, to come back to the very principle of construction which I would apply to the law throughout. A liberal construction of the 8th section, vests in the Penns the whole geographical contents of their manors, whether sold or unsold; and then adds to the grant the rents reserved out of the parts sold. The words are, 'All the lands, &c. duly surveyed, &c., together with the quit or other rents, or arrearages of rent, reserved out of the said proprietary tenths, or manors, or any part or parts thereof sold.' Now, to reduce this section to the standard of common sense, we have at once to reject the geographical limits, and circumscribe the thing granted to the estate or interest existing in the Penns at the time specified. Nor is it immaterial, to note the particular phraseology here made use of. The words are, 'reserved out of the said proprietary tenths, or manors, or the part or parts thereof which have been sold.' Now the lands sold to these defendants below, were sold out of the general funds of the State, and the quit-rent on these was reserved out of the land of the State, and not of the manor, for that had no legal existence when this sale and reservation were made. The land was not sold as part of the manor, nor was the rent reserved out of part of the manor.
 
 
 106
 But, secondly; there is not a pretext for this supposed resulting legal estate in the Penns, except the assumed reservation to them of the balance of purchase money on the grants held within their lines upon common terms. And how does this stand? It will be found to be only an implied grant, to which this implied legal estate is appended; an implication tacked to another implication; and finally, as the concluding link of this chain of implication, that ejectment is the remedy reserved for the recovery of that balance of the purchase money, which is itself the subject of the first implication.
 
 
 107
 If the rights of the Penns be circumscribed by the positive enactments of this law, then are they not only precluded from all claim to the balances due by this class of grantees, but also from those due by every description of purchasers; for there is no positive provision in the law which vests those balances in them. Their quit-rents are expressly reserved to them in the manors, but not so with their balances of purchase money. But in the 9th and 10th sections, these arrearages of purchase money are excepted from the provisions of the law, without any express declaration to whom they shall belong; and from this, an implication is supposed to result in their favour. But surely, so far as relates to the balances due by the general grantees, the implication is so far from being a necessary implication, that its bearing is altogether the other way; the implied intent of the Legislature is against a construction so obviously inconsistent with the general purposes of that body; a construction producing such an unjust, unreasonable, and improbable discrimination between innocent and equally meritorious men of the same class. Construe the act so as to confine the grant to the Penns to their private interests in the manors, and it becomes sensible and consistent throughout; and while it secures to them, on the one hand, all the interests which, as individuals, they are entitled to; on the other hand, you extend to all other individual citizens, one uniform rule of legislation and relief.
 
 
 108
 Again; there is no reason for supposing that when the Legislature uses the terms tenths and manors aforesaid, in the 9th section, or the said tenths and manors, in the 10th section, that it uses them in any other sense than that in which they are used in the 8th section. The terms used, in fact, identify their meaning. But a correct construction of the terms used in the 8th section, in describing these tenths, or manors, is fatal to all implication in favour of the Penns, with reference to any interest in the lands legally seated, previous to their appropriation. The words are, 'tenths, or manors, duly surveyed and returned into the land office.' But who will deny, that these words are to be construed with reference to the intent and effect of such surveys? And what was that intent and effect? simply to appropriate unseated lands. Would these proprietaries have been content in laying off these surveys, to have been precluded and deprived of half their interest by previous surveys, over which they could not have exercised the right of selling or retaining, as they thought proper? If not, then, so far as relates to previously ceded lands, they never were appropriated by them, and it cannot be predicated of them, that in the sense of the parties they were surveyed and returned.
 
 
 109
 The construction now contended for, is obviously an after thought of the plaintiffs below, growing entirely out of a supposed ambiguity in the words of the confiscation act, and would have been strenuously resisted, had they been so applied when their surveys of manors were first made.
 
 
 110
 Again; the rule of construction applicable to leases and wills are not essentially different in their principles. In legislating on this subject, the State had assumed all the rights, and, at least, could exercise all the powers of a manor-holder, in making his last will. Although by the charter, the purchasers under manors are restricted from any alienation of their purchases, by which they might be devested of the incident of holding directly of the manor, it is obvious that such a change of estate might be produced, by the act of the manorholder. Suppose, then, the grantees of the manor of Springetsbury had sold any portion of the soil, and devested it of this incident, lying, we may suppose, in the very centre of the whole, would a devise in the very words of this act, 'to wit, of the manor of Springetsbury, as duly surveyed and returned,' have been construed to carry the portion previously disposed of? Or, to pursue the analogy further; suppose the purchase money unpaid, and a covenant by indenture of the tenant to pay the money to the vendor and his heirs, and even to hold the land charged with the payment, would a devise of the manor carry the money so reserved, or the devise of the debt carry the freehold in the land sold?
 
 
 111
 But, on this doctrine of implication I will make another observation. It is rebutted by the provisions of the instrument itself; and, in the case of a will, would be considered as an undisposed residue; for, when we look through the whole act, and find this 8th section to be the only one which purports to give any thing to the proprietaries, their whole interest having been previously confiscated; and when, in this section, we find their individual interests in the soil of the State, whether acquired as other individuals, or as proprietary appropriations, carefully designated, and even to the arrearages of quit-rents on such lands, expressly reserved to them; surely the implication arises, that this section was intended to embrace the whole provision meant to be made for them out of the common patrimony of the State.
 
 
 112
 The omission to mention and reserve the arrearages of purchase money due on the manorial sales, might, with much greater reason, be urged as raising a presumption against their claims even to those balances. This, however, I reject; and for a reason which serves to throw some light upon the subsequent clauses of this statute; which is, that as the Legislature, in so many words, recognises these alienations as individual sales, they very properly considered the balances due thereon as private debts; and, as no confiscation of private debts could be implied from the enacting clauses of the act, so no express reservation of such balances was deemed necessary. The subsequent exceptions in favour of balances due on manorial lands, therefore, I consider as intended only to guard against an extension of the words of the law to such individual contracts. The nine tenths of the soil, and the balances of purchase money due on such parts as had passed to individuals, they considered as the property of the body politic, and appropriated it as such to the State. The one tenth set apart for the proprietaries, they propose to put on the same footing with their individual interests, properly so called, and with it, to reserve to them the balances due on the lands appropriated to themselves. These are fair and consistent inferences, if not positive enactments; but it would be much more consistent with the positive enactments, to hold, that all the balances due on the lands circumscribed by the manorial lines, were still at the disposition of the Legislature, than that they meant to confer on the Penns more than they have declared, or made discriminations among the citizens at large, which no reason or policy could justify.
 
 
 113
 Upon the questions that have been raised upon the operation of the law, commonly called the seven years law, or the law of 1705, (though of much greater antiquity,) it may be proper to make a few remarks.
 
 
 114
 I cannot see a reason why this law should have been supposed obsolete, more especially with reference to the early day in which it must have acted upon the interests of the parties in this cause. On the contrary, it appears to have been a favourite law of the colony, for we find it enacted and re-enacted, in opposition to reiterated repeals by the King in council, as will be seen by reference to Carey and Bioren's edition of the Laws. In the same work, we find it printed under sanction of the Legislature, and republished under the same authority, as lately as 1810. Indeed, upon reference to the concessions which composed the fundamental laws of the colony, we find the very law in its present terms; and are led to the conclusion, that its constitutional character gave it a peculiar sancity in the eyes of the Commonwealth. Another consequence, also, results from its very early enactment; which is, that, contrary to a ground taken in argument, it must be construed as having a prospective effect, since it was adopted at a time when there could not have existed a case for it to govern, if solely retrospective. Of this law it has been remarked, that for 116 years it does not appear that a cause has been won or lost on the basis of it. And had the decisions of the State Courts, prior to the revolution, been preserved, the observation would have had its influence. But in the absence of reports of such adjudications, there cannot exist such satisfactory evidence on the subject as to sustain the fact. One thing is very certain, that some beneficial influence must have been felt from its existence, or it would not have been so often and so pertinaciously insisted on by the colonists. If it covered their estates in no other way than by preventing suits, its great purposes were answered; and its sovereign influence, in this respect, may well be inferred, from the assumed non-existence of decisions at law. It preserved health, if it did not cure disease. At present, it is unquestionably repealed by the act of 1785, for the two acts cannot stand together. The latter act extends the limitation of suits to twenty-one years; but if the limitation of seven years would produce the same effect, then would the prior law repeal the latter, or render it a mere nullity. And this accounts for its not having been heard of for the last forty years, which may be called the period of reported causes. Its repeal, however, at that time, has no influence upon its previous effect upon the rights of these parties.
 
 
 115
 It has been remarked of this law, as incontestable, that it could not convert an equitable into a legal estate: But this doctrine appears to me to do more than render the law obsolete; it renders it a mere nullity in its origin. What is gained by an estate's continuing an equitable estate? From its inherent strength, unaided by the law, if accompanied with continued possession, it would continue a good equitable estate; and why should not the comprehensive words, 'shall for ever give an unquestionable title against all,' be construed into a transmutation from an equitable into a legal title? How can any but a good legal title be denominated an unquestionable title? and why should not all comprise legal as well as equitable claimants? The opinion below supposes the signification of those terms to be circumscribed by the words 'during the estate.' But from this I must dissent, since these words do not necessarily convey that meaning, and are more properly applied to the distinction of estates into terms for years, estates for life, estates in fee, in tail, &c.; all which may be either legal or equitable. Neither can I acquiesce in that part of the opinion, which considers a discharge from the purchase money of the land, as a necessary consequence of giving effect to the seven years law, as against the plaintiffs below in this cause; for the lien might continue, though a legal and absolute estate be vested in the defendants below. And, to prevent the operation of this law in favour of the possession, lest the claim for the purchase money should incidentally be barred, appears to be inverting the order of things; for, by the acts limiting suits on contracts, the suit for the purchase money might by possibility be barred; while the remedy to recover the land was still in full force, being of longer duration. The superior purpose of quieting estates of freehold, also would, under that doctrine, be controlled by the inferior one of enforcing open contracts, or implied covenants. While the most ordinary means of adjusting contracts for the sale of lands on credit remained in practice, there could be no danger, in giving credit on sales, of losing both land and money, as the Court supposes. But if that consequence did follow, non constat, but that the public interest, as well as private tranquillity, might have been promoted by it.
 
 
 116
 To me it appears, that this seven years law has had a sovereign influence over the rights of property in that State. I have no doubt that it is under its influence the doctrine has grown up, that a possessor of the soil need not produce a patent to protect his freehold; as well as the doctrine, that those words which, on the face of the warrant, would seem a condition, shall not be held to produce nore than a contract and a lien.
 
 
 117
 But if this seven years law did not quiet the possession of the defendants below, I confess I am at a loss to understand the principle upon which that effect is denied to the limitation act of 1785. Was their estate void or voidable, legal or equitable? In every point of view, the law appears to me to operate in their favour.
 
 
 118
 The opinion below is thus expressed: 'Possession, to create a bar by length of time, must be adverse, which it cannot be, if the defendant's entry was under a title derived from the plaintiffs.' That a possession, to sustain a bar under the act, must be adverse, is unquestionable. But when the Court comes, in the next member of the period, to explain what is meant by an adverse possession, we find the doctrine asserted, that a possession cannot be held adverse to the title of him from whom it is derived. This doctrine I hold to be altogether untenable; and this sentence alone, though every other idea be put out of the case, would, in my view of the subject, entitle the plaintiffs here to a reversal of the judgment. The title acquired by a vendee is most peculiarly adverse to that of him from whom he purchases.
 
 
 119
 But under what view of the subject could these plaintiffs be held mere tenants at will to the parties plaintiffs below? or their possession any other than an adverse possession? They did not hold as the agents or representatives of those through whom they derived the title. From the time of entering into possession, they held in virtue of the estate in themselves, and not that of any other. If the idea is, that the proprietaries might at any time have entered upon them, and in that sense, the estate was held at their will, the answer is, that is one of the very cases that the act of limitation provides against; for it takes away that volition in the proprietary, unless the entry be made in twenty-one years. But the fact was not so; these tenants did not hold at the will of the proprietaries, for all those who acquired under the common terms were taken under the care of the law and we find act upon act to regulate the proceedings of the proprietary towards them. The right to turn them out by the shoulders never existed in the proprietary; he must have resorted to his entry, or suit, to recover possession; they were considered as holding a freehold, and the law did not entitle him to resume possession arbitrarily. It was the doctrine of that State, that his rights were restricted to the payment of the purchase money and quit-rents, at least until he tendered a return of advances and improvements. It cannot be imagined that the reservation of quit-rents converted the purchasers into tenants at will; neither principle nor authority would sanction the idea. Nor can I perceive any thing either in the legal relations or contracts of these parties, that could sustain the doctrine that the possession of the defendants was permissive, and identified with that of the proprietary. A tenancy at will, must be the result of contract, express or implied; but a freehold granted on condition, is not converted by forfeiture into a tenancy at will. Yet, had it been otherwise, surely lapse of time, general acquiescence, and received opinion, ought to be held to produce the same cansequences as to the tenure of property in this State, which were produced by the same causes in England upon the tenure by copy of court-roll. That which was in its origin nothing but a tenure at will, retains now nothing of its origin but the formula which attests its history.
 
 
 120
 To conclude let the estate of these defendants below be considered as either void or voidable, and I see not how the act of limitations is to be escaped by their antagonist. If voidable, on failure to pay the purchase money, the entry is expressly taken away by that statute; and if void, they cannot be reduced lower than to the grade of tenants by sufferance, with regard to whom entry and suit was just as indispensable, as with regard to any other tenure. (Co. Lit. 57.) In the application of the doctrines on the statute of limitations, the incidents to the two tenures ought not to be confounded.
 
 
 121
 Judgment affirmed.
 
 
 
 [1]
 1 Smith's Laws 529
 
 
 [2]
 2 Ibid. 102
 
 
 [3]
 1 Smith's Laws 48
 
 
 [4]
 5 Ib. 416. art. 16.
 
 
 [5]
 B. Franklin's App. 9, 10.
 
 
 [6]
 Ricard v. Williams, 7 Wheat. Rep. 119.
 
 
 [7]
 Id. 109. 1 Phill. Ev. 119, 120. 125.
 
 
 [8]
 Moody v. Vandyke, 4 Binn. 41. Vincent v. Huff, 4 Sergt. and Rawle, 301.
 
 
 [9]
 Griffith v. Cochrane, 5 Binn. 105.
 
 
 [10]
 2 Laws of Penn. 299.
 
 
 [11]
 Blight v. Rochester, 7 Wheat. Rep. 535.
 
 
 [12]
 2 Smith's Laws 137, Note.
 
 
 [13]
 4 Dall. Rep. 407.
 
 
 [14]
 2 Smith, 133. Note.
 
 
 [15]
 Penn v. Lord Baltimore, 1 Ves. 444.
 
 
 [16]
 4 Dall. Rep. 02. 410. Penn v. Klyne, 1 Peters' Rep. C. C. 6 Laws of Penn. 205.
 
 
 [17]
 Phill. Ev. 118, 119.
 
 
 [18]
 Ib. 117, 118.
 
 
 [19]
 1 Dall. 67.
 
 
 [20]
 Barr v. Gratz, 4 Wheat. Rep. 213.
 
 
 [21]
 Branett v. Ogden, 1 Johns. Rep. 230. Doe v. Campbell, 12 Johns. Rep. 365.
 
 
 [22]
 2 Caines, 183. 13 Johns. Rep. 118.
 
 
 [23]
 16 Johns. Rep. 293.
 
 
 [24]
 3 Johns. Cas. 124. 8 Johns. Rep. 220. 9 Johns. Rep. 163. 12 Johns. Rep. 365. 10 Johns. Rep. 475.
 
 
 [25]
 1 Caines, 444. 2 Caines, 215. 3 Johns. Rep. 499.
 
 
 [26]
 2 Johns. Cas. 358. 4 Johns. Rep. 230.
 
 
 [1]
 Morris v. Thomas, 5 Binney, 77.
 
 
 [2]
 M'Coy v. Dickinson College, 4 Sergt. & Rawle, 305.
 
 
 [3]
 See Alexander v. Pendleton, 8 Cranch, 462. Base v. Gray, 4 Wheat. Rep. 213. M'Clary v. Ross, 5 Wheat. Rep. 116. Ricard v. Williams, 7 Wheat. Rep. 59.
 
 
 [4]
 3 Dallas, 457. 465.