JENNINGS v. BROWN.

No. 1909, Okla. T.   Opinion Filed March 2, 1908.

(94 Pac. 557.)

1.   EJECTMENT—Title to Support Action. In a statutory action in the nature of ejectment, plaintiff can recover only by showing either a legal or equitable title in himself and the right of possession.

2.   ESTOPPEL—Equitable Estoppel—Ratification of Acts of Others—Deeds. Where an action is pending to cancel a deed from P. to L. during which time L. conveys to B., who, without being a party to said suit, takes the lot subject to the determination of said action, but when P., by proper act, ratifies the conveyance from L. to B. for a valuable consideration, although said original action to which L. and P. are parties is prosecuted to final decree

canceling such conveyance, yet the conveyance from L. to B. is valid, and P. would be estopped by its acts of ratification from assailing said conveyance to B.

3. **SPECIFIC PERFORMANCE—Unratified Parol Contracts for Sale.** A parol agreement made by J. with D., vice president of P., a corporation, for the purchase of a lot which was never ratified or acquiesced in in such a way as to create an estoppel by its board of directors, would not entitle J. to have such contract performed by such corporation in equity.

4. **CHAMPERTY AND MAINTENANCE—Grants of Land Held Adversely—Knowledge of Suit—Presumption.** Before a conveyance taken by a person under the terms of section 2111, 1 Wilson's Rev. & Ann. St. 1903, would be void, it must appear that the person taking the same knew of the pendency of the suit, and, in the absence of a record of conviction or evidence proving such knowledge, the presumption is that such party had no such knowledge.

(Syllabus by the Court.)

*Error from District Court, Kay County; before Bayard T. Hainer, Judge.*

Ejectment by J. K. Brown against Charles Jennings and another. Judgment for plaintiff, and Charles Jennings brings error. Affirmed.

This is an action in ejectment instituted on the 13th day of March, 1902, by the defendant in error, as plaintiff in the court below, against Charles Jennings and Susan Jennings, defendants below, said Charles Jennings being the plaintiff in error in this court. The defendant appeared and filed demurrer on the 11th day April, 1902, and afterwards withdrew said demurrer and filed an answer on the 17th day of April, 1902. In referring to said parties hereinafter, reference will be made to them by the position occupied in the trial court. In defendant's answer he entered a general denial and specially pleaded that he was the equitable owner of said lot, and that the plaintiff withheld the west side from him wrongfully, and prayed that his title be quieted and he be given possession of the entire lot upon the issues. Trial was held to the court without the intervention of a jury, and judg-

ment was rendered in favor of the plaintiff. Motion for a new trial was duly made and overruled, exceptions saved, and this appeal prosecuted.

The plaintiff, to sustain his allegations, first introduced a patent dated January 12, 1895, from the United States government to J. W. Lynch. Second. A deed from said Lynch to Brown and Knapp, being the said J. K. Brown and one A. J. Knapp, dated August 4, 1897. Third. A deed from said Knapp and wife to said plaintiff to an undivided half interest in same, dated September 14, 1899. Fourth. The defendant introduced a deed from said Lynch and wife to the Ponca City Land & Improvement Company, dated January 12, 1895, and also a decree of the district court of Kay county in case No. 452, styled Burton S. Barnes and John W. Dalton, Partners as Barnes & Dalton, Plaintiffs. v. Tohn W. Lynch, D. C. Pryor, Ponca City Land & Improvement Company, Minnie Lynch, H. F. Hatch, and the Farmers' National Bank of Arkansas City, Defendants, which action was pending on August 4, 1897. Fifth. The defendant offered in evidence a certain deed, dated January 12, 1895, from J. W. Lynch and Minnie Lynch to the Ponca City Land & Improvement Company covering the lot in question.

Thereupon, among other things, the defendant in his own behalf, testified:

"Q. You are in possession of about one-half of the lot in controversy, are you? A. Yes, sir. Q. You may state under what claim of right you are in possession of this lot. A. Well— Q. Answer particularly with reference to the Ponca City Land & Improvement Company, whose deed, under the deed just offered in evidence? A. Why, it was in the winter of 1895 and 96. I don't remember just what time it was though. Just along some time the fore part of 1896, I think, or the latter part of 1895. I think it was 1896. Q. What claim have you to it? A. Well, I was to have a title to it, to the lot, from the company. Q. Under what claim did you take possession? A. I went and seen them about the lot, and they told me I might have it. Mr. Lynch is one, and Mr. Dalton one, and Mr. Barnes. I don't re-

member whether I talked much with Mr. Barnes or not, but to
Mr. Lynch and Mr. Dalton.  Q.  Have you any contract or deed
that you went into possession under?  A.  I had no contract for
a deed.  I just went into possession and put my improvements
on there.  Q.  Under an oral understanding?  A.  Yes, sir.  Q.
Did you pay anything?  A.  No, sir; I wasn't to pay anything
until I got the title cleared up.  I offered to put up the money,
but there was no money put up.  Q.  What connection did this
Dalton you mention have with the Ponca City Land & Improve-
ment Company?  What office did he hold?  A.  Vice president
of the company I think.  Q.  What was the arrangement between
you and him under which you went into possession?  A.  Well,
it appears there was a scuffle over the title, and, whoever it fell to,
I was to have the title to it when they got this litigation settled.
Q.  You didn't pay anything?  A.  No, sir.  Q.  Had no re-
ceipt or deed or writing whatever?  A.  None at all.  Q.  State
just what took place between you and Mr. Dalton, what the con-
tract was?  A.  Well, I wanted the lot if they could give the
title to it, but it was in litigation some way, I don't know just
how, but they claimed they couldn't make a title at that time, but
I was to have the title to it for $50 as soon as they could give me
title to it, and I took possession and put my fence and houses and
improvements on there, and wells, with that understanding.  Q.
You were to pay $50 as soon as they could give you title to it?
A.  Yes, sir.  Q.  And they were to deed it to you as soon as
they could on that payment?  A.  Yes, sir.  Q.  And that con-
tract embraced the lot now in controversy?  A.  Yes, sir.  Q.
That lot 19 in block 6 mentioned?  A.  That's it.  Q.  Under
that contract you went into possession?  A.  Yes, sir.  Q.  What
improvements did you put on that lot?  A.  I have got a fence on
the north side of it.  Q.  But what did you put on under the con-
tract, not what you have now?  A.  Put that fence.  Q.  What
kind of a fence?  A.  High board fence, about as high as my head.
I think about 90 feet of the back of the lot, 85 or 90, and 30 feet
across the lot.  Q.  What building did you put on it?  A.  There
is a closet there, 4 by 6 I think.  Q.  What is it?  A.  A closet
and a henhouse, small henhouse.  Q.  You don't mean you are
living on this lot?  A.  Lot 18 is where our house is, and this is
adjoining it on the north.  Q.  Is your house on this lot?  A.
Not the one I am living on, but my improvements are on it.  Q.
Any other building besides that one you mentioned on there?  A.

There is a woodshed. Q. What else? I believe you mentioned the well. Describe that. A. There is a well 52 feet deep. Q. Curbed, is it? A. Yes, sir. Q. What is the approximate value of these improvements you put on the lot? A. Oh, I expect about $75. Q Have you at all times been willing and able to pay the $50 under your agreement with the company through Mr. Dalton? A. Yes, sir. Q. Mr. Dalton made this contract, and you dealt with him as the representatives of the company, did you? A. Yes, sir. Q. Now, you may state what you know of Mr. Brown knowing of your occupancy of the lot at the time he purchased it, and of your improvements on it, and your claim to it. A. Mr. Brown came there a day or two before he bought it. I don't know as he bought it for about a week afterwards, three or four days. He had been away that day, but he was in front of the door, and asked me whose lot that was, and I told him it was mine and my improvements, and I was to have a title to it when they could give me title. Q. That was just a day or two before he bought it, you say? A. I think it was about the day before he bought it."

Cross-examination:

"* * * Q. Were you married at the time? A. No, sir; I was not. Q. Now, don't you know as a matter of fact that your wife was occupying this lot south of 19, and that you were not occupying it at all? It was her improvements that was on there? A. A part of it was. Q. That she was occupying the lot, and you had nothing to do with it at that time? When were you married? A. Married the 6th day of January, 1897. Q. Now, prior to that time, you had nothing to do with that property, had you? A. Yes, but I went and seen them for her. We had that talked over. Q. You had that talked over? A. Yes, sir. * * * Q. Did you have any agreement with Lynch about this lot? A. Lynch was to deed me this property if it fell to him, and the last talk we had was one evening. I was coming from the south part of town, and at his barn we talked about it, and he asked me about paying for it, and I told him whenever the title was clear I would pay him for it, and he said to let it go until the thing was cleared up, and that was the last conversation we had about it, right at his barn one evening."

The other proof as to the value of the improvements shows the

same to be worth $50. J. W. Lynch was a stockholder and director of the Ponca City Land & Improvement Company. There is no evidence in the record that the knowledge of this verbal agreement with Jennings was ever carried to the board of directors of said company, or majority thereof, or that they ratified same. Lynch denied that he ever made any verbal agreement with said defendant. In rebuttal, plaintiff offered a deed, dated September 10, 1895, from the Ponca City Land & Improvement Company to J. W. Lynch. Further proof was offered to the effect that on August 19, 1901, a deed covering said lot from said company in favor of said Brown and Knapp was delivered to E. J. Dick, their attorney, having been turned over to H. P. Newport, agent of said company, by Mr. Guthrey, its secretary; the execution of said deed having been duly authorized by proper resolution passed by its board of directors on December 18, 1897. And at the same time the deed from Lynch to Brown and Knapp, dated August 4, 1897, was ratified; said resolution being in *haec verba:*

"Be it resolved that the transfer of the following property by J. W. Lynch to the respective parties named below be ratified and approved: * * * Brown and Knapp. Lot 19. Block 6. $65.00 * * * And that the consideration received therefor be credited on the indebtedness of the company to said J. W. Lynch, and that the president and secretary be and are hereby instructed and empowered to make good and sufficient warranty deeds conveying said property to the respective parties above named. * * *"

Also, a deed in due form executed on the 14th day of September, 1895, by A. J. Knapp and wife to J. K. Brown, covering the undivided one-half interest in said lot, was introduced.

*C. W. Ransom* and *Barnum & Burns,* for plaintiff in error.
*Hackney & Lafferty,* for defendant in error.

WILLIAMS, C. J. (after stating the facts as above). This being a statutory action in the nature of ejectment, plaintiff could recover only by showing legal or equitable title in himself and the right of possession. 2 Wilson's Rev. & Ann. St. § 4788. Defend-

ant claims that plaintiff's chain of title was broken by the deed of January 12, 1895, from Lynch to the Ponca City Land & Improvement Company, and the cancellation of the deed dated September 10, 1895, wherein said company reconveyed to Lynch. As the cause wherein the Ponca City Land & Improvement Company, J. W. Lynch, and others were parties was pending at the time of the conveyance from Lynch to Brown on August 4, 1897, consequently Brown purchased said lot subject to the determination of that suit, though never having been made a party to the same, which resulted in the decree of February 28, 1898, offered in evidence by the defendant in the court below, unless prior to or after such final decree the board of directors of said company for the original, or other valid, consideration of said deed of August 4, 1897, from Lynch to Brown and Knapp, ratified the same, or did some act to create an estoppel after Brown had taken actual possession of the west half of said lot. On December 18, 1897, when said deed from Lynch to Brown and Knapp was ratified by the board of directors of said company, the legal title, as well as the actual possession, of the west half of said lot was then in said Brown and Knapp. This validated the title of said Brown and Knapp to said lot 19, block 6, in question, so far as said Ponca City Land & Improvement Company was concerned. And therefore said Brown and Knapp, never having been made parties to said action after the date of said ratification, were as to said lot not affected by said decree. *Ansonia v. Cooper et al.*, 64 Conn. 543, 30 Atl. 760. The subsequent delivery of a deed by said company covering said lot to E. J. Dick, attorney for said Brown, shows what the intention of the company was, and accords with said ratification resolution. If the Ponca City Land & Improvement Company were to institute an action against Brown for the possession of the portion of said lot that he is in the actual possession of, would not said ratification act as an estoppel at least against said company? *Sheldon H. B. Co. v. Eichmeyer H. B. U. Co.*, 90 N. Y. 607; *McCreary v. Pearsons*, 31 Kan. 451, 2 Pac. 570. Hence we conclude that the legal title was in the plaintiff, and such

title as would entitle him to judgment for possession unless defendant had such an agreement with the party in whom was vested the legal title, or had authority to act, as would give him a right to enforce specific performance. There is no proof to show that the oral agreement with Dalton, the vice president of the company, as construed by the defendant, was ratified or acquiesced in in such a way as to create an estoppel, by its board of directors, which would certainly have been necessary before defendant would be entitled to have such contract performed in equity. 1 Wilson's Rev. & Ann. St. 1903, § 780; *Union Pacific Ry. Co. v. McAlpine*, 129 U. S. 305, 9 Sup. Ct. 286, 32 L. Ed. 673.

The next contention is that, at the time of the execution and delivery of the deed from Lynch to Brown and Knapp, Jennings was in such adverse possession of the lot as to render said deed void. Section 2111 of Wilson's Rev. & Ann. St. 1903, vol. 1, is in *haec verba:*

"Every person who takes any conveyance of any lands or tenements, or of any interest or estate therein, from any person not being in the possession thereof, while such lands or tenements are the subject of controversy, by suit in any court, knowing the pendency of such suit, and that the grantor was not in the possession of such lands or tenements, is guilty of a misdemeanor."

In this record there is nothing to indicate that Brown and Knapp, or either of them, knew anything of the pendency of such suit. And in the absence of record of conviction under said section, or evidence proving such knowledge of the pendency of such suit, the presumption is that they had no such knowledge. Section 2112 of Wilson's Rev. & Ann. St. 1903, vol. 1, is as follows:

"Every person who buys or sells, or in any manner procures, or makes or takes any promise or covenant to convey any pretended right or title to any lands or tenements, unless the grantors thereof, or the person making such promise or covenant has been in possession of the same, or of the reversion and remainder thereof, or have taken the rents and profits thereof, for the space of one year before such grant, conveyance, sale, promise or covenant made, is guilty of a misdemeanor."

The question arises now as to whether or not Lynch had been in possession of said lot for the space of one year at the time Lynch conveyed to Brown and Knapp. *Long-Bell Lumber Co. v. Martin*, 11 Okla. 192, 66 Pac. 328; *Huston v. Scott* (decided by this court at this term), *ante,* p. 142, 94 Pac. 512. Had there been any adverse possession to Lynch and said company whatever, much less under color of title?

"* * * The possession of a vendee holding under a parol executory contract of purchase is not adverse to that of this vendor until he has performed the conditions therein or repudiated the latter's title." (1. Cyc. p. 1044.)

The occupancy of said lot by Jennings under his own showing was neither adverse to the company nor to Lynch. *Brown v. Huey,* 103 Ga. 448, 30 S. E. 430; *Kirk v. Taylor,* 8 B. Mon. (Ky.) 267; *Ganble v. Hamilton,* 31 Fla. 401, 12 South. 230; *Lucas v. Brooks,* 18 Wall. (U. S.) 436, 21 L. Ed. 779; *Kirk v Smith,* 9 Wheat. (U. S.) 241, 6 L. Ed. 81; 1 Warvelle on Vendors, p. 201. Verbal permission, by the vendor of land to the purchaser, to take possession at any time, is a mere license, revocable at pleasure, so long as the terms of the sale are unfulfilled. *Gault v. Stormont,* 51 Mich. 637, 17 N. W. 214.

The plaintiff at the time of the institution of this action being vested with title, and defendant's contract not being enforceable either against the company or Lynch to the extent of establishing title in himself, and there being no adverse possession under color of title, the judgment of the court below should be affirmed, and it is so ordered.

All the Justices concur.